05-568

IN THE SUPREME COURT OF THE STATE OF MONTANA

2007 MT 351

IN THE MATTER OF
THE MENTAL HEALTH OF D.V.,

> Respondent and Appellant.

APPEAL FROM:   District Court of the Eighth Judicial District,
In and For the County of Cascade, Cause No. BDI-2005-0122
Honorable Julie Macek, Presiding Judge

COUNSEL OF RECORD:

> For Appellant:

> Brian Bulger (argued), Bulger Law Offices, Great Falls, Montana

> For Appellee:

> Hon. Mike McGrath, Montana Attorney General, John Paulson (argued),
> Assistant Attorney General, Helena, Montana

> Brant Light, Cascade County Attorney, Mary Ann Ries,
> Deputy County Attorney, Great Falls, Montana

Argued and Submitted:  June 14, 2006

Decided:  December 19, 2007

Filed:

_____
Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 Following a jury trial in the District Court for the Eighth Judicial District, Cascade County, D.V. was involuntarily committed to the Montana State Hospital (MSH) for 90 days. The District Court also ordered that MSH could administer medications to D.V. through injections without D.V.'s consent. D.V. appeals. We reverse and order the District Court to vacate the commitment order.

¶2 D.V. raises the following issues on appeal:

¶3 1. Whether counsel rendered ineffective assistance in violation of D.V.'s rights under the Sixth Amendment to the United States Constitution and Article II, Section 24 of the Montana Constitution.

¶4 2. Whether the District Court erred in allowing the testimony of the appointed "friend" of D.V. when the court had earlier deemed that the "friend" had a conflict of interest.

¶5 3. Whether the examination and evaluation by the court-appointed professional person satisfied statutory guidelines.

¶6 Because we determine that Issue 2 is dispositive, we do not address Issues 1 and 3.

## Factual and Procedural Background

¶7 On June 24, 2005, D.V., a 48-year-old man, was arrested for partner and/or family member assault and detained at the Cascade County Detention Center (the CCDC). D.V. allegedly threatened his mother when she refused to give him a checkbook which she indicated was for an account that had been closed. While incarcerated, D.V. refused to sleep, refused his medications, and was reportedly suffering a full-blown manic episode.

¶8 On June 30, 2005, the Cascade County Attorney filed a Petition for involuntary commitment alleging that D.V. appeared to be suffering from a serious mental illness that rendered him a danger to himself and to the community. The Petition requested that the District Court order D.V. to undergo a mental health evaluation. The Petition also requested that, if it was determined that D.V. was mentally ill, the court order that he be involuntarily committed to a mental health facility for treatment.

¶9 The District Court held a hearing on July 5, 2005, to determine whether D.V. should undergo a mental health evaluation. D.V. was represented at the hearing by Vince Van der Hagen of the Cascade County Public Defender's Office. D.V. interrupted the proceedings several times stating, among other things, that he wanted to act as his own attorney, and calling the judge a "jackass." At the close of the hearing, the court found that there was probable cause to believe that D.V. was seriously mentally ill, thus the court appointed Dr. Mark Mozer, a Great Falls psychiatrist, to conduct an examination. In addition, the court ordered D.V. to be transported to the psychiatric unit at MSH for detention pending further court appearances. Following the hearing, the District Court issued a written order for Dr. Mozer's evaluation and appointed D.V.'s mother to be the "friend of respondent" pursuant to § 53-21-102(8), MCA.

¶10 On July 11, 2005, Carl Jensen of the Cascade County Public Defender's Office filed a motion for a confidential mental health evaluation of D.V. by another professional person of D.V.'s choosing. The court granted the motion. On July 13, 2005, Matthew McKittrick of the Cascade County Public Defender's Office advised the court that he and Dr. Mozer had gone to the CCDC for the purpose of conducting the court-ordered mental

health evaluation of D.V., but D.V. was uncooperative to the extent that Dr. Mozer was unable to complete the evaluation.[1] In addition, D.V. refused to communicate with McKittrick and told him that he was fired.

¶11 A jury trial was held on July 25, 2005, regarding D.V.'s involuntary commitment. Lawrence LaFountain of the Cascade County Public Defender's Office represented D.V. during the trial. During a conference with counsel and D.V. prior to voir dire, the court addressed several matters raised by D.V. and LaFountain. D.V. wanted a continuance of the trial claiming that he had been assaulted by the staff at MSH and that he needed to have a blood test for an alleged infection and an examination by a doctor for alleged injuries. The court noted that D.V. did not appear to have any injuries, hence the court declined D.V.'s request to be sent to the emergency room.

¶12 D.V. also claimed that the presiding Judge, the Hon. Julie Macek, had a conflict of interest because she had prosecuted a prior involuntary commitment case against him. Judge Macek stated for the record that she had no recollection of D.V., and LaFountain agreed that there was no legal conflict of interest.

¶13 In addition, D.V. complained that he did not know who LaFountain was, that LaFountain had not called him during the previous week, that he was firing LaFountain, and that he wanted to represent himself. D.V. also complained about LaFountain's failure to subpoena any witnesses, but LaFountain responded that after reviewing the file, there were no witnesses he wished to subpoena for D.V. LaFountain also stated that he

---

[1] D.V. was transported from MHS to the CCDC solely for the mental evaluation. He was returned to MHS immediately following his meeting with McKittrick and Dr. Mozer.

4

would not be calling the doctor who had conducted the independent evaluation of D.V.

¶14 LaFountain informed the court that D.V. wanted to act as co-counsel and that LaFountain believed it would be detrimental to D.V.'s case, especially if D.V. could not refrain from interrupting the proceedings. LaFountain also advised the court that D.V. was behaving toward him in the same manner as he had behaved toward the other attorneys in LaFountain's office. LaFountain stated his belief that D.V.'s detrimental behavior would continue and that D.V. should be removed from the courtroom during the trial.

¶15 The District Court determined that it was in D.V.'s best interests to have LaFountain represent him as LaFountain had a considerable amount of experience in such cases. Consequently, the court denied D.V.'s request to fire LaFountain and represent himself. The court advised D.V. that the trial would proceed in an orderly fashion, that D.V. had a right to be present during the proceedings, and that if D.V. disrupted the proceedings, the court would admonish him outside the presence of the jury, but would not remove him unless D.V. refused to behave and follow the court's rules.

¶16 During voir dire, D.V. repeatedly interrupted the proceedings with questions, comments, and accusations. D.V. attempted to dismiss the entire jury panel at the conclusion of voir dire and made several remarks about certain prospective jurors. The District Court declared a recess and engaged D.V. in a lengthy discussion, outside the presence of the jury, in an effort to reduce D.V.'s outbursts and to allow him to remain in the courtroom.

¶17 When the trial resumed, Dr. Mozer testified that his mental evaluation of D.V. was

5

limited by D.V.'s refusal to cooperate, which Dr. Mozer attributed to D.V.'s mental illness. Dr. Mozer further testified that he had provided care for D.V. since November 2004 and was familiar with D.V.'s mental health history. Dr. Mozer stated that D.V. suffered from a schizoaffective disorder, a mental illness with features of both a mood disorder and a psychotic mental illness. Dr. Mozer described D.V.'s symptoms and the recent progression of his illness, opining that in his present state of mind, D.V. posed a danger to himself and to others. Dr. Mozer recommended that D.V. be committed for mental health treatment. He testified that he considered local outpatient and inpatient programs and rejected them as unsuitable to D.V.'s needs, especially since D.V. failed to participate in the past and refuses to participate at the present time.

¶18 The State attempted to call D.V.'s mother to testify about the incident which led to the assault charge and subsequent petition against D.V. LaFountain moved to disqualify her because she was serving as the court-appointed "friend" pursuant to § 53-21-102(8), MCA. The court agreed that as both the complaining witness and the "friend," D.V.'s mother had an inherent conflict of interest. Consequently, the court granted LaFountain's motion to preclude her from testifying.

¶19 Thereafter, the State asked the court to appoint a different "friend" for D.V. so that D.V.'s mother could testify, but the court refused. The court did grant the State's motion for a short recess so that it could locate additional witnesses.

¶20 In addition, LaFountain informed the court that D.V. wanted to put himself on the witness stand against LaFountain's advice and LaFountain inquired of the court whether D.V. could be kept from testifying if LaFountain and the "friend" agreed that he should

6

not. The court noted that § 53-21-119, MCA, provides that if the respondent is not capable of making an intentional and knowing decision about waiving his rights, those rights may be waived by respondent's counsel and the "friend" of respondent, acting together, as long as a record is made of the reasons for the waiver.

¶21 After trial resumed, the State called Robert Neal, a detention officer at the CCDC. Neal testified that when he attempted to assist one of the nurses at the CCDC in giving D.V. his medications, D.V. threw a bag of feces at him. The State also called Kathy Ann English, a social worker at CCDC, and Laurel Andercheck, a nurse practitioner at CCDC. They both testified to D.V.'s manic behavior while at CCDC describing D.V. as being agitated, angry, aggressive, hostile, abusive, and out of control. Andercheck also stated that D.V. hollered non-stop and refused to take his medications.

¶22 LaFountain did not present any witnesses or exhibits on D.V.'s behalf. LaFountain told the court, in chambers, that D.V. was becoming more agitated and combative as the trial progressed and that he would concede that D.V. suffers from a serious mental illness. LaFountain indicated that he had discussed D.V.'s condition with D.V.'s mother, the appointed "friend," and that he decided to waive the remainder of the jury trial and proceed directly to the commitment hearing.

¶23 D.V.'s mother was called into chambers to make a record of her agreement with LaFountain. She stated that D.V. was not competent, that he was unable to make rational decisions, and that he was not capable of making an intentional and knowing decision about whether he should testify. She also expressed her agreement with LaFountain that the proceedings should be ended and that the court should consider the issues of

7

commitment and placement.

¶24 D.V. interrupted continuously throughout this conference, making various accusations and threats against his mother and LaFountain. LaFountain informed the court that D.V.'s own expert had concurred with Dr. Mozer's assessment of D.V.'s mental condition. LaFountain stated, and the State concurred, that under the statutes and relevant case law, it was appropriate to waive further jury proceedings.

¶25 The District Court determined that there was a sufficient record to substantiate the allegations of the Petition. The court agreed that D.V. was suffering from a mental illness that was being aggravated by the trial proceedings. In addition, the court found that D.V. was not capable of making an intentional and knowing decision in his best interests at that point in time. Consequently, the court excused the jury and proceeded to consider whether D.V. should be committed to MSH or treated at a local facility. In that regard, the State argued that D.V. should be committed to MSH, while LaFountain argued that D.V. should be treated at a local facility such as Benefis in Great Falls or Pathways in Kalispell.

¶26 In its Findings of Fact, Conclusions of Law, and Order for Commitment to Inpatient Mental Health Care filed July 25, 2005, the court determined that D.V. was suffering from a mental disorder as defined in § 53-21-102(7), MCA; that he was unable to provide for his own basic needs of food, clothing, shelter, health and safety; and that he posed an imminent threat of injury to himself and to others. The court concluded that the least restrictive placement for D.V., after considering all the alternatives necessary to protect D.V. and the public, and to permit effective treatment, was to commit D.V. to

8

MSH. Thus, the court issued an Order committing D.V. to MSH for 90 days. The court also ordered that, if necessary, the attending physicians at MSH could administer medications to D.V. through intra-muscular injections or other prescribed means without D.V.'s consent.

¶27 D.V. appeals the District Court's findings, conclusions and order.

## Standard of Review

¶28 Our review of the constitutional issues of due process and right to counsel involves questions of law and our review of such questions is plenary. *In re Mental Health of K.G.F.*, 2001 MT 140, ¶ 17, 306 Mont. 1, ¶ 17, 29 P.3d 485, ¶ 17 (citing *Pickens v. Shelton-Thompson*, 2000 MT 131, ¶¶ 7-8, 300 Mont. 16, ¶¶ 7-8, 3 P.3d 603, ¶¶ 7-8; *State v. Okland*, 283 Mont. 10, 14, 941 P.2d 431, 433 (1997)).

## Discussion

¶29 D.V. asserts that even though a determination in his favor on any of the three issues presented will not assist him since his commitment to MSH has expired, the issues are not moot. On that basis, D.V. maintains that a determination of the issues raised here will assure that D.V., and others facing similar involuntary commitment in the future, will have their right to counsel more fully protected, will help set out guidelines for the appointment of "friends," and will give direction for mental health evaluations.

¶30 "Mootness is a threshold issue which we must resolve before addressing the substantive merits of a dispute." *Havre Daily News, LLC v. City of Havre*, 2006 MT 215, ¶ 31, 333 Mont. 331, ¶ 31, 142 P.3d 864, ¶ 31 (citing *Grabow v. Montana High School Ass'n*, 2000 MT 159, ¶ 14, 300 Mont. 227, ¶ 14, 3 P.3d 650, ¶ 14). " 'A matter is moot

9

when, due to an event or happening, the issue has ceased to exist and no longer presents an actual controversy . . . . A question is moot when the court cannot grant effective relief.' " *Havre Daily News*, ¶ 31 (quoting *Shamrock Motors, Inc. v. Ford Motor Co.*, 1999 MT 21, ¶ 19, 293 Mont. 188, ¶ 19, 974 P.2d 1150, ¶ 19). An issue "will not be considered moot if it is 'capable of repetition, yet evading review.' " *Heisler v. Hines Motor Co.,* 282 Mont. 270, 275, 937 P.2d 45, 48 (1997) (quoting *School Dist. No. 4 v. Bd. of Personnel App.*, 214 Mont. 361, 364, 692 P.2d 1261, 1263 (1985)).

> In order to prove that a given situation is capable of repetition, yet evading review, a party must show:
> (1) the challenged action was in its duration too short to be fully litigated prior to the cessation or expiration of the action; and
> (2) there was a reasonable expectation the same complaining party would be subjected to the same action again.

*Heisler*, 282 Mont. at 275-76, 937 P.2d at 48 (citing *School Dist. No. 4,* 214 Mont. at 364, 692 P.2d at 1263).

¶31   In *Matter of N.B.*, 190 Mont. 319, 620 P.2d 1228 (1980), N.B. was involuntarily committed to Warm Springs State Hospital for three months of evaluation and treatment. We concluded in that case that the important constitutional questions presented there were not rendered moot by N.B.'s release from the hospital. *N.B.*, 190 Mont. at 322-23, 620 P.2d at 1231. Similarly, after K.G.F. was involuntarily committed to Golden Triangle Mental Health, she contended that she was denied effective assistance of counsel during the course of the commitment proceedings. We concluded in *K.G.F.* that the controversy was not moot even though K.G.F. was no longer subject to the 90-day commitment order because the claimed constitutional right to effective assistance of

10

counsel in civil involuntary commitment proceedings is capable of repetition, yet evading review. *K.G.F.*, ¶ 20.

¶32 We agree with D.V. that the important questions presented here are not rendered moot by his release from MSH. D.V.'s 90-day involuntary commitment to MSH was too short in duration to allow the issues presented to be fully litigated prior to his release. Moreover, there is a reasonable expectation that D.V. could be subjected to the same action again in the future. Hence, the issues presented here are capable of repetition, yet evading review. *Heisler*, 282 Mont. at 275, 937 P.2d at 48. Having determined that this case is not moot, we proceed to the dispositive issue raised by D.V.

¶33 *Whether the District Court erred in allowing the testimony of the appointed "friend" of D.V. when the court had earlier deemed that the "friend" had a conflict of interest.*

¶34 The District Court appointed D.V.'s mother as his "friend" under § 53-21-102(8), MCA, to act in his behalf in "dealing with legal proceedings, including consultation with legal counsel and others." D.V.'s mother, however, was also the individual D.V. allegedly assaulted, which conduct brought about the commitment proceedings. On that basis, LaFountain moved to bar her from testifying at trial about the assault incident. The court agreed, stating:

> So I do not believe that it is appropriate to allow the testimony of the friend of the respondent in the position of a complaining witness. I think that's an inherent conflict of the respondent's right to privacy, the respondent's right to effective counsel, and would violate the whole reason that we appoint friends of respondents. I don't think it's appropriate to have them also be the complainant.

¶35 Even though the court determined that D.V.'s mother had a conflict of interest, the

11

court did not appoint a substitute "friend" to protect D.V.'s interests. In addition, the court later permitted D.V.'s mother, as the court-appointed "friend," to make a record of her consent to the waiver of D.V.'s statutory rights. D.V. now asserts that this was error as the inherent conflict of interest in this situation prevented his mother from being an effective "friend."

¶36 Section 53-21-102(8), MCA, defines the "friend" of the respondent as:

> *any person willing and able to assist* a person suffering from a mental disorder and requiring commitment or a person alleged to be suffering from a mental disorder and requiring commitment in dealing with legal proceedings, including consultation with legal counsel and others. *The friend of respondent may be the next of kin, the person's conservator or legal guardian, if any, representatives of a charitable or religious organization, or any other person appointed by the court to perform the functions of a friend of respondent set out in this part.* Only one person may at any one time be the friend of respondent within the meaning of this part. In appointing a friend of respondent, the court shall consider the preference of the respondent. The court may at any time, for good cause, change its designation of the friend of respondent. [Emphasis added.]

Thus, based on the language in this statute "any person" could be appointed by the court to act as the "friend" of the respondent. The statute does not delineate any qualifications for acting as the "friend," nor does it set forth any sort of job description for the "friend."

¶37 D.V. makes a valid point that commitment proceedings are the only type of judicial proceeding where potentially anyone taken off the street may be appointed to act for another individual and given the power to waive that individual's rights and to have that individual stripped of their freedom and dignity for a period of up to six months. We agree with D.V. that in order to protect the privacy, liberty and due process rights of respondents in commitment proceedings, at a minimum, the "friend" should be someone

12

who is unbiased and objective and, certainly not, as in this case, the complaining witness.

¶38    Section 53-21-119, MCA, gives the "friend" of respondent enormous power over the respondent:

> **Waiver of rights.** (1) A person may waive his rights, or if the person is not capable of making an intentional and knowing decision, *these rights may be waived by his counsel and friend of respondent* acting together if a record is made of the reasons for the waiver. The right to counsel may not be waived. The right to treatment provided for in this part may not be waived.
>
>    (2) *The right of the respondent to be physically present at a hearing may also be waived by his attorney and the friend of respondent with the concurrence of the professional person and the judge* upon a finding supported by facts that:
>
>    (a) the presence of the respondent at the hearing would be likely to seriously adversely affect his mental condition; and
>
>    (b) an alternative location for the hearing in surroundings familiar to the respondent would not prevent such adverse effects on his mental condition. [Emphasis added.]

Thus, without any proper criteria delineated in our statutes for appointing an unbiased individual to act as the "friend" of respondent, an individual acting as the "friend," but who did not have the respondent's best interests in mind, could waive respondent's rights, have respondent committed to a mental institution, and thereby, deprive respondent of his liberty and potentially gain control of respondent's property. Such a conflict of interest is contrary to the rights afforded every Montanan under Article II, § 17 of the Montana Constitution and the Fourteenth Amendment to the United States Constitution.

¶39    We stated in *K.G.F.* that "one purpose of our laws governing the treatment of 'seriously mentally ill' persons is to 'ensure that due process of law is accorded any person coming under the provisions of [Title 53, Chapter 21].' " *K.G.F.*, ¶ 26 (quoting

13

§ 53-21-101(4), MCA). Hence, we constructed in *K.G.F.* a standard for ensuring the fundamental fairness of civil commitment proceedings as they relate to the effectiveness of counsel and we set forth the following authority for doing so:

> *Matter of W.M.* (1992), 252 Mont. 225, 229, 828 P.2d 378, 381 (stating that civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection, and citing *Addington v. Texas* (1979), 441 U.S. 418, 425, 99 S. Ct. 1804, 1809, 60 L. Ed. 2d 323, 330-31); *Matter of Shennum* (1984), 210 Mont. 442, 450-51, 684 P.2d 1073, 1078 (stating that procedural safeguards in commitment cases were "inserted by the legislature because of the calamitous effect of a commitment: a deprivation of a person's liberty for up to three months . . . and the inevitable damage to a person's reputation"). *See also Foucha v. Louisiana* (1992), 504 U.S. 71, 80, 112 S. Ct. 1780, 1785, 118 L. Ed. 2d 437 (stating that freedom from bodily restraint has always been at the core of the liberty protected by the due process clause from arbitrary governmental action); *Mathews v. Eldridge* (1976), 424 U.S. 319, 334, 96 S. Ct. 893, 902, 47 L. Ed. 2d 18 (stating that due process is "flexible and calls for such procedural protections as the particular situation demands").

*K.G.F.*, ¶ 24.

¶40 We further stated in *K.G.F.*, that courts must safeguard the due process rights of the individual involved at every stage of the proceedings. *K.G.F.*, ¶ 42 (citing *Matter of Mental Health of L.C.B.*, 253 Mont. 1, 7, 830 P.2d 1299, 1303 (1992)). That necessarily includes the appointment of the "friend" of respondent at the time of the initial appearance. And, a standard for ensuring the fundamental fairness of civil commitment proceedings as they relate to the appointment of the "friend" of respondent should be established. Consequently, we urge the Legislature to amend Title 53, Chapter 21, and set forth some qualifications or criteria to appoint only unbiased and objective individuals to act as "friend" of the respondent in commitment cases.

¶41 In this case, we hold that the District Court erred in appointing D.V.'s mother to

act as his "friend" when she was also the complaining witness. Such appointment was a conflict of interest and prejudiced D.V.'s right to a fair trial, thus we reverse on this issue.

¶42 The dissent implies that we object to the appointed "friend" being the respondent's "next of kin" or someone with "foreknowledge or previous involvement with a respondent." On the contrary, what we fault in this case is that the "previous involvement" entails the "friend" being the victim of the crime which brought about the commitment proceedings. We are not saying that D.V.'s mother was the wrong person to act as his "friend" because she is his mother, or as the dissent characterizes it, that she is "taint[ed]" because of her kinship with D.V., we are saying that she was "taint[ed]" because she was the victim of the crime that put D.V. into this situation. Whether or not D.V.'s mother testified in court about the actual crime, the fact remains that she was his victim. D.V.'s due process rights cannot be fully served by having the victim of his crime determine whether or not he should be committed.

¶43 Moreover, while, as the dissent asserts, the record here may "scream[] out the necessity of D.V.'s commitment," the victim of D.V.'s crime should not be the one turning those screams into action. D.V.'s mother was not the right person to represent D.V.'s interests in this case. And, contrary to the dissent's assertion that "any conflict of interest between D.V. and his 'friend' clearly did not affect the outcome of the commitment hearing," in actuality the conflict prevented the commitment hearing from proceeding—D.V.'s "friend" and his attorney made the decision to stop the hearing— thus, it not only *affected* the outcome, it *prevented* any outcome from the hearing itself.

¶44 Reversed with instructions that the District Court vacate the order of commitment.

/S/ JAMES C. NELSON

We Concur:

/S/ KARLA M. GRAY
/S/ PATRICIA COTTER
/S/ W. WILLIAM LEAPHART

Justice Jim Rice dissenting.

¶45 Vacating D.V.'s commitment is not only unnecessary by reason of his mother's service as his "friend," but such relief has not even been requested by D.V. Further, it is not this Court's role to add its own requirements to the statute governing appointment of a "friend." Therefore, I dissent.

¶46 D.V. argues that his mother should not have been appointed as his "friend" and as a consequence urges that "her opinion should not be considered" by this Court. His only other request is that "[f]uture commitment cases should make certain that the appointed Friend, although apparently not needing any qualifications of any kind, certainly should be an objective party." He does not ask that his commitment be vacated.

¶47 And for good reason. D.V. has presented no evidence or argument that he was prejudiced by his mother's participation in the commitment proceeding, and indeed, no prejudice to D.V. can be drawn from this record. To the contrary, the record here screams out the necessity of D.V.'s commitment, and any conflict of interest between D.V. and his "friend" clearly did not affect the outcome of the commitment hearing. D.V.'s counsel decided to abort the trial without any testimony having been given by D.V.'s mother, because the District Court had excluded it. Any objectively unbiased

16

"friend" who may have been appointed could not have come to any other reasonable conclusion but that D.V.'s commitment was abundantly necessary. As well described by the Court's opinion, D.V.'s lack of competence was undisputable, given his behavior prior to and during trial.

¶48 "This Court has repeatedly stated that a district court's decision will not be reversed or remanded when the eventual result of the case would be the same without the error." *In re S.C.*, 264 Mont. 24, 30, 869 P.2d 266, 269 (1994) (citation omitted). "It is well established that no civil case shall be reversed by reason of error which would have no significant impact upon the result; if there is no showing of substantial injustice, the error is harmless." *In re C.B. & J.B.*, 2001 MT 42, ¶ 16, 304 Mont. 252, ¶ 16, 20 P.3d 117, ¶ 16 (citation and internal quotations omitted). There being no question that the result here would have been the same even with a different "friend," we should not vacate D.V.'s commitment.

¶49 Secondly, the Court urges the Legislature to review Title 53, Chapter 21, in order to designate qualifications and guidelines in selecting individuals to act as "friends" in commitment cases. I agree with the Court's recommendation to the Legislature. However, the Court then proceeds without legislative participation and inserts its own requirement that a "friend" must have no conflicts of interest. Merely because the Legislature did not provide guidelines for appointing a "friend" does not mean it is this Court's duty or prerogative to insert them. "[O]ur role in interpreting a statute is simply to ascertain what is in terms or in substance contained within that statute, neither omitting what has been inserted nor inserting what has been omitted by the legislature."

17

*MacMillan v. State Compensation Ins. Fund*, 285 Mont. 202, 208, 947 P.2d 75, 78 (1997) (emphasis added) (citing § 1-2-101, MCA).

¶50    The Court should be mindful of the function served by the "friend."  The "friend" is not the respondent's legal counsel, but, rather, is designed to serve a very different purpose.  A "friend" must be "willing and able to assist a person suffering from a mental disorder," may be "the next of kin" and is selected in consideration of the respondent's preferences.  Section 53-21-102(8), MCA (2003).  The "friend" is supposed to help the respondent through the process, including consultations with legal counsel and other professionals, and past familiarity with the respondent is encouraged.  Section 53-21-102(8), MCA (2003).  However, there will be few "next of kin" who, though able to assist a respondent, do not carry the "taint" of foreknowledge or previous involvement with a respondent.  It is unwise for the Court to impose restrictions without proper consideration of the unique role to be fulfilled by the "friend" and the difficult position in which a commitment proceeding may place the respondent's next of kin who are called upon to help the respondent, whose rights are no doubt the priority.  There are rarely easy solutions, and I would await the Legislature's study and action on this matter.

¶51    I dissent.

/S/ JIM RICE

Justice John Warner and Justice Brian Morris join the dissenting opinion of Justice Rice.

/S/ JOHN WARNER
/S/ BRIAN MORRIS