
DA 08-0021

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2009 MT 41

IN THE MATTER OF:

D.M.S.,

      Respondent and Appellant.

| | |
|---|---|
| APPEAL FROM: | District Court of the Twenty-First Judicial District, In and For the County of Ravalli, Cause No. DI 07-20 Honorable James A. Haynes, Presiding Judge |

COUNSEL OF RECORD:

      For Appellant:

            Jim Wheelis, Chief Appellate Defender; Koan Mercer, Assistant Appellate Defender; Helena, Montana

      For Appellee:

            Hon. Steve Bullock, Montana Attorney General; John A. Paulson, Assistant Attorney General; Helena, Montana

            George H. Corn, Ravalli County Attorney; William E. Fulbright, Deputy County Attorney; Hamilton, Montana

                  Submitted on Briefs: December 3, 2008

                            Decided: February 18, 2009

Filed:

          _____
                         Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1     D.M.S. appeals from the order of the District Court of the Twenty-First Judicial District, Ravalli County, committing D.M.S. to the Montana State Hospital (MSH). We reverse.

¶2     Appellant raised five issues on appeal. Because we reverse and remand on the issue of causation, which is dispositive, we will not address the remaining issues. Thus, we restate the sole issue on appeal as follows:

¶3     Was there sufficient evidence that a rational trier of fact could have found, beyond a reasonable doubt, that D.M.S. caused injury, or posed an imminent threat of injury to himself or others because of his mental disorder?

### FACTUAL AND PROCEDURAL BACKGROUND

¶4     D.M.S. was charged with two felony counts of driving under the influence of alcohol (DUI) on two occasions in 2007 and was also the prime suspect in a felony arson investigation involving five vehicle fires. Based on a competency evaluation of D.M.S., the District Court adjudicated D.M.S. unfit to proceed in the criminal cases due to the mental disease or defect of cognitive disorder not otherwise specified (NOS), combined with alcohol abuse, borderline intellectual functioning and antisocial personality disorder. The District Court returned D.M.S. to MSH for ninety days of inpatient treatment to attempt to help D.M.S. gain fitness to proceed in the criminal trials; however, at the end of that period, D.M.S. had not gained fitness and, according to staff at MSH, was unlikely to do so in the reasonably foreseeable future. The District Court then dismissed the two

2

criminal cases, pursuant to § 46-14-221(3)(a), MCA, and the Ravalli County Attorney immediately filed a petition for the commitment of D.M.S., pursuant to § 53-21-121, MCA.

¶5 In December 2007, the District Court held a detention hearing and ordered that D.M.S. remain detained at MSH and appointed Dr. Casey as a "professional person" in the matter, pursuant to § 53-21-122(2), MCA. Dr. Casey evaluated D.M.S. and concluded D.M.S. "does not meet the criteria for commitment" at MSH. The State then filed a motion for an additional examination to be performed by Dr. Mozer, pursuant to § 53-21-123(2)(a), MCA, but D.M.S. refused to meet with Dr. Mozer. D.M.S. filed a motion to dismiss the petition for commitment, arguing that Dr. Mozer had been unable to conduct a successful examination and the only professional recommendation available to the court was by Dr. Casey, who recommended against commitment. The District Court denied the motion. D.M.S. also filed pretrial motions seeking to prevent the State from introducing evidence regarding his criminal history prior to a 2005 head injury, which both parties stipulate caused his cognitive disorder NOS, and evidence regarding the District Court's decision that he was unfit to proceed in the two DUI cases. The District Court excluded the evidence regarding his pre-2005 convictions but allowed evidence regarding his being found unfit to proceed in the criminal cases.

¶6 The commitment case was tried before a jury on December 27 and 28, 2007. Because both parties stipulated D.M.S. suffered from a mental disorder in the form of cognitive disorder NOS, the only issue at trial was whether D.M.S. required commitment

3

under § 53-21-126, MCA. The State called several law enforcement officers to testify concerning the alleged DUI and arson offenses. One officer testified that when he stopped D.M.S. in December 2006, D.M.S. smelled strongly of alcohol, failed a horizontal gaze nystagmus test, admitted he had been impaired to where he could not safely operate his vehicle and, when arrested, became angry and profane. The State introduced other testimony that, in March 2007, deputies from the Ravalli County Sheriff's Office investigated reports of unoccupied vehicles that were set on fire at two different trailheads. D.M.S.'s vehicle was seen at one of the trailheads at the time of the fires. One of the deputies located and stopped D.M.S.'s vehicle, which at the time had a flat tire and was being driven on the rim. According to the officer's testimony, D.M.S. showed signs of intoxication and admitted to having consumed "a couple beers." The arresting officer found evidence possibly connected to the arson, including broken glass in D.M.S.'s boots and on the floor and seat of the patrol car in which D.M.S. was transported. Law enforcement also found other items in D.M.S.'s vehicle, such as a hammer with particles of glass in its handle, matches, lighters, an empty can labeled "kerosene," and alcoholic beverage containers, some empty and some full.

¶7 The State then called Dr. Mozer to testify regarding D.M.S.'s mental condition. D.M.S. moved to dismiss on the grounds that Dr. Mozer's evaluation was statutorily insufficient to support commitment to MSH because Dr. Mozer only reviewed D.M.S.'s file and did not evaluate him personally. The District Court denied the motion and then

4

ordered that D.M.S. submit to an additional examination by Dr. Mozer. D.M.S. objected to this mid-trial evaluation and refused to speak with Dr. Mozer.

¶8 At the conclusion of the commitment trial, the jury returned a special verdict form, which concluded the following: D.M.S. suffers from a mental disorder; because of a mental disorder and "through an act or an omission, [D.M.S.] caused self-injury or injury to others . . .;" there exists an "imminent threat of injury to [D.M.S.] or to others because of [D.M.S.'s] acts or omissions . . .;" and, if his mental disorder goes untreated, it will "predictably result in deterioration of [D.M.S.'s] mental condition to the point at which [D.M.S.] will become a danger to self or to others or will be unable to provide for [his] own basic needs of food, clothing, shelter, health, or safety . . . ." The District Court then committed D.M.S. to MSH for ninety days.

¶9 Following D.M.S.'s commitment to MSH, the District Court reheard the issues on D.M.S.'s fitness to stand trial. The court then reversed its prior decision that D.M.S. was unfit for trial and reinstated the DUI charges. D.M.S. now appeals the District Court's order of commitment.

¶10 Since D.M.S. has already served his commitment at MSH, a question arises as to whether this matter is now moot. This Court has held that appeals from judgments of civil commitment are not rendered moot by the expiration of a ninety-day involuntary commitment, because such a commitment is too short in duration to allow the issues to be fully litigated prior to the respondent's release. *In re Mental Health of D.V.*, 2007 MT 351, ¶ 32, 340 Mont. 319, 174 P.3d 503. Furthermore, the stigma associated with an

involuntary commitment and the potential for damage to reputation extend well beyond the actual time a person is committed. Thus, because of the short duration of D.M.S.'s commitment as well as the potential damage to D.M.S.'s reputation because of being involuntarily committed, the matter before us is not moot.

## STANDARD OF REVIEW

¶11 In an involuntary commitment proceeding, the State must prove its case beyond a reasonable doubt with respect to any physical facts or evidence and by clear and convincing evidence as to all other matters. Section 53-21-126(2), MCA; *Matter of D.D.*, 277 Mont. 164, 167, 920 P.2d 973, 975 (1996). This Court has not articulated a specific standard of review for involuntary commitment cases where a jury serves as the trier of fact. However, because the burden of proof for the State is the same in both an involuntary commitment proceeding and a criminal trial—that the State must prove its case beyond a reasonable doubt—we analogize to the standard we use in a criminal trial. Where the sufficiency of the evidence is at issue in a criminal trial, regardless of whether a judge or a jury serves as the trier of fact, the standard of review is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Brogan*, 261 Mont. 79, 87, 862 P.2d 19, 24 (1993), *State v. Clark*, 2008 MT 419, ¶ 14, 347 Mont. 354, 198 P.3d 809. Thus, we will review the sufficiency of the evidence supporting a jury's special verdict in a civil commitment case to determine whether any

6

rational trier of fact, viewing the evidence in a light most favorable to the State, could have found the essential elements necessary for commitment beyond a reasonable doubt.

**DISCUSSION**

¶12 *Was there sufficient evidence that a rational trier of fact could have found, beyond a reasonable doubt, that D.M.S. caused injury, or posed an imminent threat of injury to himself or others because of his mental disorder?*

¶13 Appellant argues "the State presented absolutely no evidence that D.M.S.'s alleged threat of imminent injury was *because* of his cognitive disorder NOS. Rather, the State's evidence was that D.M.S. was dangerous because of his alcoholism and because of [a] life long pattern of criminal activity." Appellant next argues these conditions do not constitute a mental disorder pursuant to § 53-21-102(9), MCA, or provide the causation necessary to find D.M.S. in need of commitment. Appellant concludes there is a "complete absence of testimony that D.M.S.'s alleged recent acts of injury or his threat of imminent injury resulted from his cognitive disorder NOS . . . ."

¶14 The State argues "[i]t was the combination of alcohol and D.M.S.'s mental disorder that caused Dr. Mozer's concern about the safety of the community and the threat posed by D.M.S." Furthermore, the State argues, "[t]he jury received sufficient testimony upon which to find that D.M.S.'s mental disorder, together with his penchant for alcohol, presented an imminent threat of injury to self or others."

¶15 At a trial or hearing on a petition for commitment, the court is tasked with determining whether or not the respondent is suffering from a mental disorder and whether he requires commitment. Section 53-21-126(1), MCA. If the court determines

7

the respondent is suffering from a mental disorder, then the court shall use the following criteria to determine whether he requires commitment:

> (a) whether the respondent, because of a mental disorder, is substantially unable to provide for the respondent's own basic needs of food, clothing, shelter, health, or safety;
> (b) whether the respondent has recently, because of a mental disorder and through an act or an omission, caused self-injury or injury to others;
> (c) whether, because of a mental disorder, there is an imminent threat of injury to the respondent or to others because of the respondent's acts or omissions; and
> (d) whether the respondent's mental disorder, as demonstrated by the respondent's recent acts or omissions, will, if untreated, predictably result in deterioration of the respondent's mental condition to the point at which the respondent will become a danger to self or to others . . . .

Sections 53-21-126(1), -127(7), MCA. Commitment is justified if any of the criteria above is satisfied, based on the court's "detailed statement of the facts upon which the court found the respondent to be suffering from a mental disorder and requiring commitment . . . ." Section 53-21-127(7), 8(a), MCA. An imminent threat of self-inflicted injury or injury to others "must be proved by overt acts or omissions, sufficiently recent in time as to be material and relevant as to the respondent's present condition." Section 53-21-126(2), MCA; *In re Mental Health of A.K.*, 2006 MT 166, ¶ 18, 332 Mont. 511, 139 P.3d 849 (citation omitted). And the State must "connect [respondent's] serious mental illness with the claimed imminent threat of injury . . . ." *A.K.*, ¶ 30.

¶16   As § 53-21-126(1)(b)-(c), MCA, above provide, before the court can commit D.M.S., the court must determine that any of the above criteria occurs *because* of D.M.S.'s mental disorder. The State did not present evidence that D.M.S.'s alleged threat

8

of injury was because of his cognitive disorder NOS. Rather, the State's evidence demonstrated D.M.S.'s alleged threat of injury was because of his history of criminal activity and because of his alcoholism.

¶17 Dr. Mozer testified as to his opinion of D.M.S.'s condition based on "review[ing] a great deal of material on him . . ." including hospital records and evaluation reports. During the State's direct examination of Dr. Mozer, counsel for the State asked Dr. Mozer whether, in his opinion, D.M.S. is a threat to others. His reply was "I'm deeply concerned that he's a threat to the community." Counsel for the State then asked Dr. Mozer on what he based that opinion and he replied "the history of violent behavior preceding the matters that have been discussed here today." Upon D.M.S.'s objection, the court did not allow Dr. Mozer to testify regarding specific acts he did not personally witness, and the State was not allowed to introduce evidence of D.M.S.'s pre-2005 criminal history. However, Dr. Mozer testified that he had read documentation of D.M.S.'s behavior from the past year and he found it to be "alarming." He also stated there were "[i]nstances of profanity and altercations" supporting his concern that D.M.S. was a threat to others. Dr. Mozer went on to testify as to his opinion of D.M.S.'s alcohol use and stated that it is a "foregone conclusion that once released into society he will be drinking again . . ." and that it is "highly predictable" that once D.M.S. begins drinking again his behavior will be a threat to others. Finally, counsel for the State inquired whether Dr. Mozer had "formed an opinion as to whether [D.M.S.'s] mental disorder will, if untreated, predictably result in a deterioration of his mental condition[.]" Dr.

9

Mozer responded "yes" and, when asked the basis for that opinion, stated "I think everyone in this room knows that alcohol greatly deteriorates a person's behavior and demeanor." Dr. Mozer also testified that, in his opinion, if D.M.S. were not committed he would be a threat to others because "[l]ess external control over his behavior surely means less self-control of his behavior." Dr. Mozer then referred to other parts of D.M.S.'s record that described him as "irritable" and "very volatile" and Dr. Mozer stated that the entirety of the record has "a great deal to say about him being dangerous."

¶18 The State also called several law enforcement officers, including a deputy sheriff and a patrol sergeant from Ravalli County Sheriff's Office to testify regarding D.M.S.'s two arrests for DUI and the traffic stop of D.M.S. in relation to the arson investigation. As part of that testimony, counsel for the State asked the detective whether there was "anything that made you concerned that he might have been driving in an impaired-appearing manner because of his medical conditions[.]" The detective responded "I had nothing to make me believe it at that time, that it was anything other than the consumption of an alcoholic beverage." The detective also stated that before he placed D.M.S. under arrest his behavior was "normal but intoxicated" but after the arrest he began to use profanity and was "very irate, very escalated." He also testified that at various times throughout the booking process D.M.S. vacillated between calm and irate.

¶19 Although this testimony may show D.M.S. suffers from various antisocial behavior patterns or alcohol abuse, neither the State nor the District Court drew a causal connection showing D.M.S. posed an imminent threat of injury to self or others *because*

of his mental disorder or that his cognitive disorder NOS caused such behavior. The testimony focused on past criminal activity and alcohol use. While a "mental disorder may co-occur with addiction or chemical dependency" the term "[m]ental disorder" "does not include . . . addiction to drugs or alcohol . . . ." Section 53-21-102(9), MCA. Dr. Mozer's testimony focused heavily on the effects of D.M.S.'s alcohol abuse and how it affected D.M.S.'s behavior. Dr. Mozer's testimony also focused on D.M.S.'s manifestations of his antisocial personality, including profanity and altercations. D.M.S.'s antisocial personality was not, however, stipulated or considered a mental disorder in this case.

¶20 The State must "connect [respondent's] serious mental illness with the claimed imminent threat of injury . . . ." *A.K.*, ¶ 30. The State did not present any evidence indicating that, because of his cognitive disorder (as opposed to alcoholism or antisocial behavior), D.M.S. caused injury or posed an imminent threat of injury to himself or others. Accordingly, the evidence presented did not establish a causal connection between D.M.S.'s cognitive disorder NOS and the behavior described in the reports or alleged by law enforcement. Even viewing the evidence in a light most favorable to the State, a rational trier of fact could not have found D.M.S. in need of commitment to MSH.

¶21 Thus, we reverse the District Court's order of commitment of D.M.S. and remand to the District Court for proceedings consistent with this Opinion.

/S/ W. WILLIAM LEAPHART

11

We concur:

/S/ BRIAN MORRIS
/S/ PATRICIA COTTER
/S/ JAMES C. NELSON


Justice James C. Nelson concurs.

¶22 I concur in the Court's Opinion. I write separately, however, to note that I would have also reversed in this case because of the violation of D.M.S.'s right to remain silent.

¶23 At the close of the State's case-in-chief, the court ordered D.M.S. to submit to a new mental health interview by Dr. Mozer. D.M.S. refused to cooperate in the interview. Both the State and the District Court then commented to the jury regarding D.M.S.'s refusal to speak with Dr. Mozer. Indeed, at the beginning of D.M.S.'s case, the court instructed the jury to the effect that the court had ordered D.M.S. to submit to further testing and that D.M.S. had declined. Furthermore, the State purposely solicited testimony regarding D.M.S.'s silence during its direct and re-direct examinations of Dr. Mozer, and the prosecutor attempted to create the impression that D.M.S. was trying to manipulate the system.

¶24 Individuals who are involuntarily detained or against whom a petition for civil commitment has been filed have an express statutory right to remain silent. Section 53-21-115(6), MCA. This right is in addition to any other rights that may be guaranteed by the United States and Montana Constitutions. Persons subject to commitment are

12

required to be advised of this right by the county attorney in writing. Section 53-21-114, MCA. This Court has recognized the existence of this statutory right to remain silent and that this right applies to professional person examinations under § 53-21-123(1), MCA. *In re Mental Health of K.G.F.*, 2001 MT 140, ¶¶ 81-83, 306 Mont. 1, 29 P.3d 485. And, we have repeatedly held that the procedural protections guaranteed respondents in civil commitment cases, such as the right to remain silent, are "critically important due to the 'calamitous effect of a commitment,' which includes loss of liberty . . . ." *In re A.K.*, 2006 MT 166, ¶ 11, 332 Mont. 511, 139 P.3d 849.

¶25 Commenting on an involuntary commitment respondent's right to remain silent is akin to the State or the court commenting on a criminal defendant's exercise of his or her right to remain silent under the Fifth Amendment to the United States Constitution or Article II, § 25 of the Montana Constitution. Both the United States Supreme Court and this Court have concluded that when that sort of comment is introduced into a criminal trial, reversible error occurs. *Doyle v. Ohio*, 426 U.S. 610, 618-19, 96 S. Ct. 2240, 2245 (1976); *State v. Sullivan*, 280 Mont. 25, 34-35, 927 P.2d 1033, 1039 (1996); *State v. Wilkins*, 229 Mont. 78, 82, 746 P.2d 588, 590 (1987). If a person's right to remain silent is to have any meaning, then the individual protected by that right must be protected from the State or the trial court using the individual's exercise of that right against him or her.

¶26 In this case, the State and the trial court both injected reversible error into D.M.S.'s commitment proceedings by commenting on his exercise of his right to remain

13

silent and to not be interviewed by Dr. Mozer. Were we not reversing on the issue of causation, I would reverse on this ground as well.

¶27 I concur.

/S/ JAMES C. NELSON

Justice John Warner dissents.

¶28 I dissent from the Court's decision to vacate D.M.S.'s commitment. I conclude sufficient evidence exists in the record for the jury to find beyond a reasonable doubt that D.M.S. recently caused injury to others and to find to a reasonable medical certainty he did so because of a mental disorder. Section 53-21-126(1)(b), (d), MCA.

¶29 As stated by the Court, in a criminal case, a motion to dismiss for insufficiency of the evidence is only appropriate if, viewing the evidence in a light most favorable to the prosecution, no evidence exists upon which a rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. *Clark*, ¶ 14; *State v. Bomar*, 2008 MT 91, ¶ 13, 342 Mont. 281, 182 P.3d 47; *State v. Swann*, 2007 MT 126, ¶ 16, 337 Mont. 326, 160 P.3d 511 (citations omitted). We review a district court's denial of such a motion de novo, because evidence is either sufficient or it is not. *Swann*, ¶¶ 16-19. However, when considering the sufficiency of the evidence, this Court should not—as I believe it does in this case—substitute its judgment for that of the trier of fact because the

14

trier of fact views the evidence firsthand, observes the demeanor of the witnesses, and weighs the credibility of each party. *State v. Maetche*, 2008 MT 184, ¶ 14, 343 Mont. 464, 185 P.3d 980; *State v. Shields*, 2005 MT 249, ¶ 20, 328 Mont. 509, 122 P.3d 421.

¶30    The Court vacates the commitment, concluding the evidence was insufficient to prove to a reasonable jury that D.M.S. is a threat to the community because of his admitted mental disorder.   However, considering all of the evidence in a light most favorable to the State, it is clearly sufficient to establish that D.M.S.'s mental disorder causes him to be dangerous.

¶31    D.M.S. exercised his right to remain silent by refusing to speak with Dr. Mozer. Nevertheless, after reviewing the evidence available to him, Dr. Mozer testified that, in his expert opinion, D.M.S. was dangerous to the community even when he was in a controlled environment.  In the structured setting of the state hospital, D.M.S. engaged in violence against other patients.  Dr. Mozer also testified that D.M.S. was an alcoholic and alcohol caused a deterioration of his mental condition.   A fair interpretation of Dr. Mozer's testimony is that the deterioration of D.M.S.'s mental condition made him dangerous.  The jury was entitled to interpret this testimony to the effect that D.M.S.'s mental disorder causes the violent outbursts and destructive behavior, not the consumption of alcohol.

¶32    Dr. Hill, a qualified mental health expert called by D.M.S., testified D.M.S. suffered a cognitive decline contributed to by alcohol abuse.  She went on to confirm that, while in a controlled setting at the state hospital, D.M.S. attacked another patient at

least once. She testified that D.M.S.'s mental disorder causes him to become violent if he does not get his way. She said D.M.S.'s mental disorder will predictably deteriorate further if left untreated and that he poses a risk to others.

¶33 Several times during the trial when things were not going his way, in the presence of the jury, D.M.S. spontaneously interjected comments, demonstrating anger as well as an inability to control himself. The jury witnessed these outbursts and was entitled to consider them in making its determination whether D.M.S.'s consumption of alcohol or his admitted mental disorder caused him to be a threat to others.

¶34 When one drinks to excess, one does not necessarily burn up vehicles. From the evidence of D.M.S.'s actions when he was sober, his actions at the trial, and the facts surrounding the arson, the jury was entitled to find that D.M.S.'s mental disorder, and not the consumption of alcohol, caused him to burn the vehicles at the trailheads.

¶35 I would conclude the jury was presented with more than sufficient evidence to find, as a matter of fact, D.M.S.'s mental disorder caused him to recently harm others and made him a danger to the community. I dissent.

/S/ JOHN WARNER

16