

DA 12-0689

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2013 MT 327

IN THE MATTER OF:

L.A.,

      Respondent and Appellant.

APPEAL FROM:    District Court of the Twenty-First Judicial District,
In and For the County of Ravalli, Cause No. DI 11-05
Honorable Jeffrey H. Langton, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

            Wade Zolynski, Chief Appellate Defender; Eileen A. Larkin, Assistant
Appellate Defender; Helena, Montana

      For Appellee:

            Timothy C. Fox, Montana Attorney General; Micheal S. Wellenstein,
Assistant Attorney General; Helena, Montana

            William E. Fulbright, Ravalli County Attorney; Hamilton, Montana

                   Submitted on Briefs:  October 16, 2013
                              Decided:  November 5, 2013

Filed:

                    _____
                                  Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1     L.A. appeals the order of the Twenty-First Judicial Court, Ravalli County, ordering her involuntary commitment and involuntary medication.  After a two-day trial, the jury concluded by special verdict that L.A. was suffering from a mental disorder, was unable to provide for her basic needs, was an imminent threat of injury to herself or others, and, if left untreated, her condition would deteriorate.  At the dispositional hearing immediately following the verdict, the District Court adopted an Order of Commitment and Transport Order submitted by the State.  In 2011, we reversed a previous order of commitment for L.A. due to the entry of an order by the District Court that employed conclusory statements of statutory criteria rather than a detailed statement of facts.  *In re L.L.A.*, 2011 MT 285, ¶¶ 11, 23, 362 Mont. 464, 267 P.3d 1.  L.A. challenges the present commitment order on the same grounds.  We affirm and review the following issues on appeal:

¶2     *1.  Did the District Court err by failing to make a detailed statement of facts in its post-trial disposition order as required by § 53-21-127(8)(a), MCA?*

¶3     *2.  Did the District Court err by failing to meet the statutory prerequisites of § 53-21-127(8)(h), MCA, to authorize involuntary medication?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶4     L.A. has previously been diagnosed as suffering from Schizophrenia.  Following her release from her previous commitment in April 2011, L.A. was on medication and her condition was stable.  She returned to live with her parents and was seen at a health clinic

2

to assist her with a treatment program. L.A. moved into her own apartment, but later moved back in with her parents. L.A. stopped taking her medication in early 2012, and her unusual behavior started to return. L.A.'s parents were concerned for L.A.'s safety and well-being, and began documenting L.A.'s behavior. Based on a report by Fred Huskey, a licensed clinical professional counselor and certified mental health professional, the State filed a petition for involuntary commitment of L.A. L.A. requested a jury trial pursuant to § 53-21-125, MCA.

¶5      At trial, L.A.'s father testified that L.A. stopped taking her medications because she believed "medications are poison and that they will kill her." He also testified regarding his concern for her health due to her refusal to seek medical treatment for health problems and her increasingly poor hygiene. L.A. would get agitated and become physically aggressive with her parents if they asked her to take her medication or otherwise suggested she had a mental disorder. He also testified that L.A. was engaging in increasingly odd behavior such as staring at the wall and laughing while alone, placing toxic substances near her private area to prevent evil from getting her, plugging the toilet with items to stop evil rays, and placing coins around her bed to protect her from evil or "bioterror." The jury viewed a videotape recorded by L.A.'s parents depicting strange behaviors by L.A. during a week long period shortly before trial. L.A.'s father also testified that L.A. was afraid to live alone due to her worsening paranoia, and was unable to pay her bills or manage her own finances.

¶6     Darby Deputy Marshall Jon Moles testified that, a few days before the trial, L.A. approached him and asked him if he could hear screaming. She then told him that someone was being murdered at Como Lake, and that people in black clothing were in town to artificially inseminate people. Irene Walters, a nurse practitioner at Riverfront Mental Health Center, testified that L.A.'s condition began to deteriorate when she quit taking her medications in early 2012. Walters testified she was afraid that L.A.'s fears were so strong that she could ultimately hurt herself or her family. Huskey testified that Schizophrenia is treatable, but if left untreated each psychotic episode results in greater damage. Huskey believed that L.A. was not able to provide for her own basic needs or safety, and could be at risk of harming herself or others. Huskey did not recommend a less restrictive plan for L.A. because of her refusal to take medication and follow up with her treatment plan.

¶7     L.A. testified on her own behalf and adamantly denied having a mental disorder. She claimed that attempts to confine and forcibly medicate her were a threat to national security, and likely the result of sexual harassment. She also claimed that if she was forced to take medication she would likely die.

¶8     The jury completed a special verdict form, concluding that by a reasonable medical certainty L.A. suffered from a mental disorder. The jury also found by clear and convincing evidence that because of her mental disorder L.A. was "substantially unable to provide for her basic needs of food, clothing, shelter, health, or safety;" that "there exists an imminent threat of injury to [L.A.] or to others because of [her] acts or

4

omissions;" and that L.A.'s mental disorder, "as demonstrated by [L.A.'s] recent acts or omissions, will, if untreated, predictably result in deterioration" to the point she "will become a danger to self or to others, or will be unable to provide for [her] own basic needs." Finally, the jury found that the physical facts and evidence necessary to support their answers were proven beyond a reasonable doubt.

¶9 Immediately after dismissing the jury, the District Court held a dispositional hearing. The court asked the State for a proposed order, which the State already had prepared. The Order of Commitment recited the findings stated on the special verdict form, which essentially tracks the language of § 53-21-126(1), MCA. The order contained five additional findings of fact, including that L.A. suffers from Schizophrenia, undifferentiated type, as diagnosed by Huskey; that, based upon the testimony, L.A. required commitment to Montana State Hospital; and that this commitment was the least-restrictive environment possible "based upon [L.A.'s] behavior and non-compliance with medications." The order committed L.A. to the Montana State Hospital for up to 90 days, and approved involuntary medication if it was deemed necessary to facilitate her treatment. The court orally stated that the commitment and involuntary medication authorization were based on findings of the jury and the report by Huskey.

**STANDARD OF REVIEW**

¶10 We exercise de novo review to determine whether a district court correctly interpreted and applied the relevant statutes. *In re Mental Health of E.P.B.*, 2007 MT 224, ¶ 5, 339 Mont. 107, 168 P.3d 662. Whether a district court's findings of fact satisfy

5

the statutory requirements is a question of law which we review for correctness. *In re L.L.A.*, ¶ 7.

¶11 It is the jury's function to weigh and resolve conflicts in the evidence, judge the credibility of witnesses, and "make the factual determinations necessary to render a verdict." *Seltzer v. Morton*, 2007 MT 62, ¶ 94, 336 Mont. 225, 154 P.3d 561. The court must defer "to the jury's constitutionally sanctioned decisional role," Mont. Const. art. II, § 26, and it is not the court's role to repeat the jury's tasks and retry a case or reweigh evidence. *Seltzer*, ¶ 94. We review a jury verdict to determine whether, viewing the evidence in the light most favorable to the prevailing party, it is supported by substantial credible evidence. *Seltzer*, ¶ 94.

## DISCUSSION

¶12 *1. Did the District Court err by failing to make a detailed statement of facts in its post-trial disposition order as required by § 53-21-127(8)(a), MCA?*

¶13 The key difference between this case and L.A.'s 2011 appeal is that the findings here were made by a jury instead of a judge. In *In re L.L.A.*, the trial judge was the trier of fact. Here, L.A. received a trial by jury and the jury found that the evidence proved beyond a reasonable doubt that L.A. suffered from a mental disorder, was unable to care for herself, posed a threat of harm to herself or others, and, if left untreated, would continue to deteriorate.

¶14 Only once in a published opinion have we addressed a case where a jury, rather than a judge, made the involuntary commitment determination. *See In re D.M.S.*, 2009 MT 41, 349 Mont. 257, 203 P.3d 776. *In re D.M.S.* involved a challenge to the

6

sufficiency of the evidence. *In re D.M.S.*, ¶¶ 3, 20. Here, L.A. does not challenge the sufficiency of the evidence to support the jury's verdict, but argues only that the District Court erred "by ordering her involuntary commitment . . . without providing a detailed statement of facts" as required by § 53-21-127(8), MCA.

¶15 Juries generally do not enter detailed findings of fact from the evidence they hear. Though the involuntary commitment statutes must be strictly followed, including the entry of "detailed findings of fact," § 53-21-127(8)(a), MCA, it is not possible for a judge, who is not privy to a jury's deliberations, to know in detail what evidence the jury accepted or rejected in reaching its verdict. To ask the judge to enter detailed findings after a jury has reached a commitment verdict would require speculation and usurp the jury process, allowing the judge's determination of the evidence to supersede the jury's. "Statutory construction should not lead to absurd results if a reasonable interpretation can avoid it." *Bitterroot River Protective Ass'n. v. Bitterroot Conserv. Dist.*, 2008 MT 377, ¶ 72, 346 Mont. 507, 198 P.3d 219 (citation omitted).

¶16 Here, the jury utilized a special verdict form upon which they indicated that the evidence proved that L.A. suffered from a mental disorder, was unable to care for herself, posed a threat of harm to herself or others, and, if left untreated, would continue to deteriorate predictably to the point of danger to herself or others. The special verdict form, along with the additional findings entered by the District Court in its order, were sufficient to satisfy the statutory requirements in a case tried to a jury.

¶17     *2. Did the District Court err by failing to meet the statutory prerequisites of § 53-21-127(8)(h), MCA, to authorize involuntary medication?*

¶18     L.A. argues the District Court erred by "authorizing her involuntary medication without providing a detailed statement of facts," citing § 53-21-127(8)(h), MCA. However, this provision does not require entry of a detailed statement of facts for purposes of authorizing the administration of medication involuntarily. That requirement is applicable only to the determination that a respondent is suffering from a mental disorder and requires commitment. *See* § 53-21-127(8)(a), MCA. The court's reasoning regarding why "involuntary medication was chosen from among other alternatives" must only be supported by the usual "findings of fact." Section 53-21-127(8)(h), MCA.

¶19     The jury determined that the evidence presented at trial proved beyond a reasonable doubt that L.A. suffered from a mental disorder and that her condition satisfied the requirements for commitment. The District Court orally noted that the order was adopted based upon the findings of the jury and the recommendations of Huskey, the designated Professional Person. Its written findings stated that the commitment and involuntary medication authorization were ordered based upon Huskey's recommendation and L.A.'s "behavior and non-compliance with medications," and that less restrictive alternatives were not appropriate for the same reason. Though these findings do not detail the particular evidence upon which the court's findings and conclusions were based, the record was replete with evidence of L.A.'s behavior and

non-compliance with medications, and the statute only required findings supporting the reasoning for the authorization. Therefore, we conclude the order was sufficient.[1]

¶20    Affirmed.

/S/ JIM RICE

We concur:

/S/ MICHAEL E WHEAT
/S/ PATRICIA COTTER
/S/ BETH BAKER
/S/ LAURIE McKINNON

---

[1] We are mindful that in *In re R.W.K*, 2013 MT 54, ¶ 32, 369 Mont. 193, 297 P.3d 318, decided after the case *sub judice* was tried, we "urge[d] the district courts to plainly and clearly state in orders of commitment whether the circumstances justify authorizing the chief medical officer or designated physician to administer medication involuntarily, and if so, the reason involuntary medication was chosen from among other alternatives." Although this task belonged to the District Court, the court's ability to identify determining circumstances was likewise inhibited by not being privy to the jury's acceptance or rejection of evidence during deliberations.