RENDERED: FEBRUARY 19, 2009
TO BE PUBLISHED

# $\mathfrak{Supreme}$ $\mathfrak{Court}$ $\mathfrak{of}$ $\mathfrak{Kentucky}$

2007-SC-000130-DG
AND
2007-SC-000365-DG

FINAL

DATE 3/12/09 Kelly Klaber D.C.

LOIS DEVASIER (AS ADMINISTRATRIX
OF THE ESTATE OF KENNEITHA CRADY)          APPELLANT/CROSS APPELLEE

ON REVIEW FROM COURT OF APPEALS
V.          CASE NOS. 2001-CA-000846 AND 2001-CA-000922
JEFFERSON CIRCUIT COURT NO. 96-CI-003734

WILLIAM JAMES, M.D.                    APPELLEE/CROSS-APPELLANT

## OPINION OF THE COURT BY JUSTICE VENTERS

## AFFIRMING

This case arises from the death of Kenneitha Crady at the hands of her boyfriend, Rene Cissell. It is the first instance in which this Court has been called upon to interpret the language of KRS 202A.400.[1] Appellee, Dr. William James, is a psychiatrist who treated Cissell. Appellant, Lois DeVaiser, is the administratrix of Crady's estate. Because we agree with the conclusion of the Court of Appeals that the trial court should have directed a verdict in favor of Dr. James, we affirm its decision, but we do so on other grounds.

The trial in the Jefferson Circuit Court resulted in a jury verdict for Dr. James. The Court of Appeals affirmed. We granted DeVasier's petition for discretionary review and Dr. James' cross-petition for discretionary review.

---

[1] In Evans v. Morehead Clinic, 749 S.W.2d 696 (Ky. App. 1988), the Court of Appeals concluded that the statute could not be applied retroactively, and therefore declined to apply it to the case before it. We are aware of no other appellate decision involving KRS 202A.400 and none has been brought to our attention.

## I. Relevant Facts

In July, 1995, Crady was attempting to end an eight year domestic relationship with Cissell. Cissell was not coping well with the breakup. He was depressed, irritable, abusing drugs, and increasingly angry. On July 12, 1995, he intentionally rammed his car into a vehicle occupied by Crady and another man, running it off the road and causing minor injuries to Crady. Nevertheless, Crady remained with Cissell. Six days later, in what he called a "scare tactic" so that she would feel the emotional pain that he felt, Cissell angrily held a knife to Crady's throat, causing a slight cut. That same day, concerned about his deteriorating emotional state, Cissell's sister Georgia Yount and Crady, took him to Inpsych Ky., Inc., an outpatient mental health facility, where a crisis evaluation was performed by mental health professionals. There, Cissell admitted his drug abuse and his prior acts of violence toward Crady. He denied any desire or intention to harm her in the future, but expressed fear that he might. Cissell was scheduled for a counseling appointment on the following day, and Crady was given advice for protecting herself from further abuse or violence.

The following day, July 19, Cissell felt his anxiety again reaching a peak. Yount and Crady took him to the Emergency Psychiatric Services (EPS) unit at University of Louisville Hospital for evaluation and treatment, with the expectation that he would be hospitalized. At EPS, Cissell was seen first by intake nurse, Gregory Howell, who performed a basic medical exam and obtained a history from Cissell, Crady, and Yount. Howell was informed of

2

Cissell's earlier aggression toward Crady and recognized him to be a "man in crisis." Howell placed Cissell in a secure room at the facility until he could be seen by Dr. William James later in the day. Before seeing Dr. James, Cissell was interviewed by Hiro Tanamachi, a licensed clinical social worker. At Cissell's request, Crady remained present while Tanamachi conducted his assessment. Upon completing his interview and assessment, Tanamachi conferred with Dr. James, who then met with Cissell and Crady together, at Cissell's request. Yount remained at the facility in a waiting room.

Dr. James concluded that civil commitment or hospitalization of Cissell was unnecessary. Cissell, Crady, and Yount left the facility together. Cissell then attended the counseling session that Inpsych had set up for him. Later that evening, he and Crady, in the presence of several witnesses, fought again. Police were called to the scene, but no arrest was made. The next day, July 20, 1995, in yet another violent altercation, Cissell killed Crady, stabbing her over forty times.

Cissell pled guilty to first-degree manslaughter and was sentenced to imprisonment for thirteen years. Appellant, on behalf of Crady's estate, filed suit in the Jefferson Circuit Court against several mental health professionals at Inpsych and EPS, including Dr. James, for his failure to comply with duties imposed upon him by KRS 202A.400. The claims against all defendants except James were either settled by the parties or dismissed by the court. At trial, James moved for a directed verdict on the grounds that DeVasier had presented no evidence that Cissell communicated to James an actual threat of

violence against Crady. The motion was overruled. The jury found that Cissell had communicated a threat against Crady, but answered "No" to the following instruction:

> It was the duty of Dr. William James in treating Rene Cissell, to exercise that degree of care and skill expected of a reasonably competent psychiatrist acting under same or similar circumstances. Do you believe from the evidence that Dr. William James failed to comply with the duty, and that such failure was a substantial factor in causing Kenneitha Crady's death?

Accordingly, judgment was entered for Dr. James. DeVasier appealed, alleging error in the failure of the trial court to instruct on the specific duties imposed under KRS 202A.400(2). James cross-appealed from the denial of his motion for a directed verdict. The Court of Appeals concluded that a directed verdict should have been granted because the evidence failed to establish that Cissell had communicated a threat of physical violence against Crady directly to Dr. James. The remaining issues were not addressed.

## II. KRS 202A.400

In Evans v. Morehead Clinic, 749 S.W.2d 696 (Ky. App. 1988), our Court of Appeals adopted Section 315 of the Restatement (Second) of Torts, recognizing that a psychiatrist who, by the exercise of ordinary care, knew or should have known that a patient posed a serious risk of violence against a foreseeable victim, owed a duty to prevent harm by controlling the patient or warning the victim. The effect of that recognition was over before it started. The Evans holding would apply only to claims preceding the 1986 enactment of KRS 202A.400, which defined the circumstances in which mental health

4

professionals in Kentucky would incur liability for harm inflicted by their patients. The general duty of care of the <u>Restatement (Second) of Torts</u> § 315 was superseded by the statute.

In the present case, we are first confronted with two issues that arise directly from the words used in the statute. KRS 202A.400(1) and (2) insulate a qualified mental health professional[2] from liability arising from a patient's violent behavior, except in certain circumstances. They provide as follows:

> (1) No monetary liability and no cause of action shall arise against any mental health professional for failing to predict, warn of or take precautions to provide protection from a patient's violent behavior, *unless the patient has communicated to the mental health professional an actual threat of physical violence* against a clearly identified or reasonably identifiable victim, or unless the patient has communicated to the mental health professional an actual threat of some specific violent act. <u>Id.</u> (Emphasis added).

> (2) The duty to warn or to take reasonable precautions to provide protection from violent behavior arises only under the limited circumstances specified in subsection (1) of this section. The duty to warn a clearly or reasonably identifiable victim shall be discharged if reasonable efforts are made to communicate the threat to the victim, and to notify the police department closest to the patient's and the victim's residence of the threat of violence. When the patient has communicated to the mental health professional an actual threat of some specific violent act and no particular victim is identifiable, the duty to warn has been discharged if reasonable efforts are made to communicate the threat to law enforcement authorities. The duty to take reasonable precaution to provide protection from violent behavior shall be satisfied if reasonable efforts are made to seek civil commitment of the patient under this chapter.

---

[2] "Mental Health Professional" is defined in KRS 202A.400(4) and it includes, among others, a registered nurse, a licensed clinical social worker, and a psychiatrist or physician engaged in mental health services.

5

Dr. James' cross-appeal in this Court, like his motion for a directed verdict at trial, requires us to look at the meaning of two phrases in the statute: first, the issue upon which the Court of Appeals based its decision, the meaning of "communicated to a mental health professional;" second, the meaning of "an actual threat." Although our attention is drawn to two specific parts of the statute, we remain mindful that our duty is to construe those parts in accord with the whole statute, keeping true to the object and policy of the General Assembly. Cabinet for Families and Children v. Cummings, 163 S.W.3d 425 (Ky. 2005).

### III. The Meaning of "Communicated to a Qualified Mental Health Professional"

The first issue of interpretation we consider is whether "communicated to a qualified mental health professional" requires an expression from the patient directly to the mental health professional, with no intervening agent; or, whether an indirect communication from the patient to the mental health professional through agents or subordinates of the mental health professional suffices. The Court of Appeals construed the phrase to require a direct expression from patient to psychiatrist with no intervening agents. Because there is no evidence that Cissell expressed a threat against Crady directly to James, the Court of Appeals held that Dr. James should have been granted a directed verdict.

DeVasier argues that the Court of Appeals erred by so holding. She asserts that the plain meaning of the word "communicated" includes

information transferred from the patient directly to the doctor, as well as indirectly though others. We conclude that the interpretation given the statute by the Court of Appeals too narrowly construes the verb, "communicated," restricting the scope and breadth of it ordinary meaning.

The verb "to communicate" in its various tenses, has no specialized legal definition. The General Assembly has informed us through KRS 446.015, that the words of a statute are intended to have their "common and everyday meanings." Black's Law Dictionary, in its 2004 edition does not include the word "communicate," but its 1971 edition defines the word to mean: "to bestow, convey, make known, recount, impart: to give by way of information." Black's Law Dictionary 349 (4th ed. 1971). The Random House Webster's College Dictionary,[3] defines "communicate" as simply "to impart knowledge of, to make known, divulge." In ordinary experiences of daily life, information is regularly imparted from one person to another through intermediaries. Knowledge is frequently transmitted through receptionists, secretaries, or voice mail recordings. Teachers send information for parents using students as messengers. In the medical profession and legal profession, as well as other technical fields, patients, clients and other users of the professional service routinely convey information to the professional through agents of the professional. All of that information has been "communicated" from the

---

[3] We do not find that a dictionary is needed to articulate the meaning of ordinary words in common usage in the English language, and our reference to these does not signify that they are any more authoritative than other standard, reputable dictionaries. We cite them only as examples of the common meaning of the word.

original source to the ultimate user. Had it been the intent of the legislature to limit the nature of the communication to a direct person-to-person transfer of information, we believe a more restrictive verb, or the adverb "directly," would have been used. Like the Court of Appeals, we adhere to the duty to afford the language of a statute its plain, commonly accepted meaning, and to construe ambiguity in such a way as to give the statute its intended effect. McLain v. Dana Corp., 16 S.W.3d 320, 326 (Ky. App. 1999). We resolve whatever ambiguity one may find in the phrase "communicated to a mental health professional" by holding now that it includes threats communicated by a patient directly to a mental health professional, and threats communicated by a patient to the mental health professional indirectly through agents or ostensible agents of that professional who have a duty to relay the patient's information. We believe this broader construction better reflects the intent and purpose of the legislature because it comports more closely with common experience and is consistent with the general principle of law that knowledge or notice to an agent is imputed to the principal. United Fuel Gas Co. v. Jude, 355 S.W.2d 664 (Ky. 1962); Williams v. St. Claire Medical Center, 657 S.W.2d 590 (Ky. App. 1983). We therefore hold that lack of a direct communication to Dr. James of a threat against Crady does not entitle him to a directed verdict.

## IV. The Meaning of "An Actual Threat"

The next question is whether Cissell communicated "an actual threat" at all. The word "threat" is an ordinary English word in common usage and readily understood by English-speaking people. It requires no specialized legal

8

definition, but in common usage the word "threat" carries two different meanings. In the trial court, and again in this Court, each party argued a different meaning of the word. The trial court did not resolve the difference, but instead ruled that the meaning of "threat" was for the jury to determine. We disagree. The interpretation of a statute is an issue of law, to be resolved by the court, and on appeal is resolved *de novo*. Bob Hook Chevrolet Isuzu, Inc. v. Commonwealth, Transportation Cabinet, 983 S.W.2d 488, 490-491 (Ky.1998). When the language of a statute is capable of two different meanings, it is for the court to determine which meaning was intended by the legislature and to instruct the jury accordingly.

In one sense, "threat" means: an expression or declaration indicating the intent or desire to inflict injury, harm, punishment, or some other disagreeable consequence upon another. The word "threat" also means: a thing or person that threatens, an impending menace or danger. In that sense of the word, a thing like a hurricane, an earthquake, a rabid dog, or a physically violent boyfriend is a "threat." It is around these two meanings of the word "threat" that the issue in this case revolves. Under either meaning, a threat is "actual" when it exists in fact, is real and genuine, as opposed to a vague or uncertain indication of a potential harm, or a statement made in jest or obvious exaggeration.

Dr. James argued at trial, and argues now, that the evidence failed to establish that Cissell ever communicated to him, directly or indirectly, an actual threat, in the form of an expression indicating that he would commit

9

physical violence against Crady. DeVasier's argument is based upon the latter meaning of the word "threat," that Cissell by his prior conduct of aggression toward Crady, posed an actual threat to her. There is no genuine issue of fact as to what Cissell did and said. James simply argues that the information communicated to him from Cissell did not constitute "an actual threat", while DeVasier argues that the information communicated to James demonstrated to him that Cissell was "an actual threat" to Crady.

When a word in a statute lends itself to different interpretations, we must resolve the ambiguity by looking at the statute as a whole. The clue to which meaning was intended by the legislature is found in the grammatical structure of the sentence in which the phrase is used - its statutory context:

> No ... liability and no cause of action shall arise against (a psychiatrist) for failing to predict, warn of or take precautions to provide protection from a patient's violent behavior, unless the patient has communicated to [the psychiatrist] an actual threat of physical violence ... or... an actual threat of some specific violent act.

KRS 202A.400(1)

By using the word "communicated," we believe the legislature intended to require a current, active expression, by words or gestures, verbal or non-verbal, to the professional; a threat capable of avoidance, not a mere passive presence from which the professional must attempt to discern if a patient poses a threat of harm. A part of the obvious purpose of the statute, because subsection (3) addresses it, is to strike a balance between the ethical duty of the mental health professional to protect a patient's confidentiality and the moral duty to prevent harm to others. The legislature did so by requiring

10

disclosure of threats "communicated" by a patient, not threats posed by a patient. Thus, we hold that the duties described in KRS 202A.400(2) arise only when the patient has communicated to the mental health professional, directly or indirectly, by words or gestures, that he will commit an act of physical violence. Simply *being* a threat of physical violence does not constitute communicating a threat of physical violence.

### V. Application of KRS 202A.400 to the evidence presented

To refute Dr. James' claim that no threat was communicated to him by Cissell, DeVasier directed our attention to the testimony of Yount, intake nurse Howell, Tanamachi, and Cissell himself. We have examined the record of the testimony of those witnesses. From the information provided to him, directly and indirectly, Dr. James knew that Cissell had been abusive to Crady, that he had previously threatened her by holding a knife to her throat, and that he had run the car in which she was riding off the road by ramming it with his car. He learned much about their troubles. One could reasonably conclude from that evidence that Dr. James knew that Cissell was a continuing danger or menace to Crady.

But the evidence cited by Appellant does not establish that Cissell *communicated* to James an actual threat to inflict harm upon Crady by physical violence. Yount, who knew Cissell to be a threat to Crady, testified that she did not witness him communicating a threat of violence against Crady to Howell, Tanamachi, or anyone at the hospital. Howell testified that Cissell was largely uncooperative and unresponsive, and said very little. When Howell

11

asked Cissell if he had thoughts of hurting someone, Cissell did not respond. Crady answered for him by showing her bruises to Howell. Howell's notation on Cissell's chart of "homicidal ideation" was based upon what Crady and Yount had told him about the prior aggressive action of Cissell. Cissell never in his own words and gestures expressed or otherwise communicated an actual intent or desire to harm Crady. In fact, he said the opposite - that he did not want to hurt her. Tanamachi, describing Cissell as "a man of few words," testified that Crady told him about the prior acts of violence by Cissell, that Cissell admitted those acts, but denied any present intention to harm Crady. Cissell testified that he told Tanamachi that he loved Crady, and that he did not want to harm her, but was afraid that he could not control himself. That is the most threatening remark Cissell made, and we conclude that it is not clear and certain enough to constitute the communication of "an actual threat" as required by KRS 202A.400. By his prior conduct and his demeanor in the presence of Howell, Tanamachi, and James, Cissell may have been an obvious threat to her, but he did not communicate to James or his associates an actual threat against her. KRS 202A.400 places no duty on James to warn Crady or to notify the authorities when a patient merely appears to be an actual threat of harm to another person. It is only when the patient communicates to him, or his associates, an actual threat that he may have liability. Absent the communication of such a threat, the statute shields him from liability stemming from Cissell's violent conduct. On that basis, we conclude Dr.

12

James was entitled to a directed verdict, and an order affirming the judgment rendered in his favor.

## VI. Jury Instructions

DeVasier also raised on appeal the failure of the trial court to instruct the jury on the specific duties that arise under KRS 202A.400 when a patient has communicated an actual threat to a mental health professional. KRS 202A.400 creates, in certain circumstances, specific duties to warn the potential victim of the threat and to notify police, or to seek a civil commitment of the patient. The statute expressly bars any other liability of a mental health professional for failing to predict, warn against or take precaution against the violent behavior of a patient. The statute eliminates the general, common law duty applied in Evans, and Section 315 of the Restatement (Second) of Torts. In such cases, the jury should not be instructed on the general duty because it is no longer the law. Instead, instructions on the statutory duties imposed by KRS 202A.400 should be given. Humana of Kentucky, Inc v. McKee, 834 S.W.2d 711 (Ky. App. 1992).

## VII. Conclusion

Because our holding on the issues of statutory construction resolves the matter before us, we decline to address other issues presented. For the reasons set forth above, we affirm the opinion of the Court of Appeals and the judgment of the trial court dismissing Appellant's claim against Appellee.

All sitting. All concur.

13

COUNSEL FOR LOIS DEVASIER (AS ADMINISTRATRIX
OF THE ESTATE OF KENNEITHA CRADY):

Paul Joseph Hershberg
Christopher A. Bates
Seiller Waterman, LLC
Meidinger Tower, 22nd Floor
462 S. Fourth Street
Louisville, Kentucky 40202


COUNSEL FOR WILLIAM JAMES, M.D.:

Walter Gregory King
Amy Olive Wheeler
Stoll, Keenon, Ogden, PLLC
2000 PNC Plaza
500 West Jefferson Street
Louisville, Kentucky 40202-2828