DA 09-0447

IN THE SUPREME COURT OF THE STATE OF MONTANA

2010 MT 15

IN THE MATTER OF THE MENTAL HEALTH OF:

M.C.D.,

       Respondent and Appellant.

| | |
|---|---|
| APPEAL FROM: | District Court of the First Judicial District, In and For the County of Lewis and Clark, Cause No. CDI 2009-51 Honorable Kathy Seeley, Presiding Judge |

COUNSEL OF RECORD:

       For Appellant:

           Joslyn Hunt, Chief Appellate Defender; Helena, Montana

       For Appellee:

           Hon. Steve Bullock, Montana Attorney General; Jonathan M. Krauss, Assistant Attorney General, Helena, Montana

           Leo J. Gallagher, Lewis and Clark County Attorney; Michael Menahan, Deputy County Attorney, Helena, Montana

                           Submitted on Briefs: January 7, 2010

                                  Decided: February 2, 2010

Filed:

           _____
                          Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1     M.C.D. appeals from the Findings of Fact, Conclusions of Law and Order of the District Court of the First Judicial District, filed July 13, 2009, committing him to the Montana State Hospital at Warm Springs for a period not to exceed 90 days.  We affirm.

¶2     M.C.D. contends on appeal that there was insufficient evidence to support the District Court's order committing him.

## PROCEDURAL AND FACTUAL BACKGROUND

¶3     M.C.D. is a 75-year-old resident of Helena, Montana, who suffers from the mental disorder of progressive vascular dementia brought on by repeated trauma to the head and cardiovascular disease.  In July, 2009, he stopped his car beside the road to defecate and was unable to stand afterwards because of weak knees.  A good Samaritan stopped but was unable to help and called authorities.  The fire department responded and took M.C.D. to the Veterans Administration Hospital at Ft. Harrison.

¶4     Personnel at the VA hospital became concerned about M.C.D.'s behavior and, after talking to his wife, attempted to keep him there.  M.C.D. left the facility and went to a stepson's house.  Police responded and returned him to the VA hospital.  M.C.D. became angry at being kept at the hospital and VA security officers responded to assist staff.  While M.C.D. was being taken into an elevator he grabbed one officer and hit the other but without inflicting any material injury.  According to M.C.D.'s description, he "got a hold of the little cop and I stuck it on the big cop."  M.C.D. was placed in a secure locked room.

2

¶5	The Lewis and Clark County Attorney petitioned the District Court to order M.C.D. committed to the Montana State Hospital at Warm Springs. The District Court held a hearing on July 10, 2009, at which witnesses testified, including M.C.D.

¶6	Kim Waples, a licensed mental health professional on staff at the VA hospital, testified that M.C.D. exhibited symptoms of vascular dementia including "behavioral disturbances, memory impairment, disturbance in executive functioning and poor impulse control." Vascular dementia is a mental disorder caused by blockages of the blood supply to the brain. He also exhibited anger, irritation and depression and left the hospital against medical advice. Waples testified that M.C.D. stated to her that his wife should be afraid of him, especially if she did not respect him. He further stated to Waples that if his wife ever called the police he would kill her "with his bare hands." When Waples asked M.C.D. if he were just upset and using figures of speech, he stated: "No, I would kill her."

¶7	On the day of the District Court hearing Waples talked to M.C.D. again. He again stated to her that his wife "better be afraid of me. She better fear me because if she doesn't—if she doesn't respect me, she better fear me." He stated that if she called the police it "would be the last phone call she ever made." Waples testified that these threatening statements were indicative of his vascular dementia and that he was an imminent threat to himself.

¶8	Stephen Nagy, M.D., also testified that that M.C.D. suffers from vascular dementia and that he exhibited classic symptoms of the disorder including loss of brain functioning resulting in cognitive impairment. He testified that M.C.D.'s refusal to

3

recognize that he had a problem and his refusal to accept treatment exemplify the lack of insight and understanding characteristic of dementia. Dr. Nagy testified that the dementia prevents M.C.D. from understanding his need to take medication and prevents him from remembering to even take his medication or make decisions about it. He testified that M.C.D. needed more assessment and medical stabilization and that involuntary medication was required to protect him and the public. The Montana State Hospital at Warm Springs was the only, and therefore least restrictive, alternative available to meet his needs.

## STANDARD OF REVIEW

¶9 This Court will disturb the district court's findings in a civil commitment case only if they are clearly erroneous, when viewed in a light most favorable to the prevailing party. *In the Matter of C.R.C.*, 2004 MT 389, ¶ 11, 325 Mont. 133, 104 P.3d 1065. A finding is clearly erroneous if it is not supported by substantial evidence, if the trial court misapprehended the effect of the evidence, or if this Court has a definite and firm conviction after reviewing the record that a mistake has been made. *Id*.

## DISCUSSION

¶10 A court considering a petition for civil commitment must determine whether the respondent is suffering from a mental disorder and if so whether he requires commitment. Section 53-21-126(1), MCA; *In the Matter of D.M.S.*, 2009 MT 41, ¶ 15, 349 Mont. 257, 203 P.3d 776. If the district court determines that the respondent suffers from a mental disorder, commitment may be based on any of the following factors:

4

(a) whether the respondent, because of a mental disorder, is substantially unable to provide for the respondent's own basic needs of food, clothing, shelter, health, or safety;

(b) whether the respondent has recently, because of a mental disorder and through an act or omission, caused self-injury or injury to others;

(c) whether, because of a mental disorder, there is an imminent threat of injury to the respondent or to others because of the respondent's acts or omissions; and

(d) whether the respondent's mental disorder, as demonstrated by the respondent's recent acts or omissions, will, if untreated, predictably result in deterioration of the respondent's mental condition to the point at which the respondent will become a danger to self or to others, or will be unable to provide for the respondent's own basic needs of food, clothing, shelter, health, or safety. Predictability may be established by the respondent's relevant medical history.

Section 53-21-126(1), MCA. Imminent threat of injury to self or others must be proven by evidence of overt acts or omissions sufficiently recent in time as to be material and relevant to the respondent's present condition. Section 53-21-126(2), MCA. A threat of injury must be connected to the mental illness. *D.M.S.*, ¶ 15.

¶11 M.C.D. does not contest the undisputed evidence in the record that he suffers from the mental disorder of vascular dementia. The record is also undisputed that symptoms of the mental disorder of vascular dementia include loss of brain functioning resulting in cognitive impairment, behavioral disturbances, memory impairment, poor impulse control, anger, irritation and depression. Therefore the issue was whether M.C.D.'s mental disorder warranted commitment.

¶12 The District Court found that M.C.D.'s mental disorder of vascular dementia required commitment. The District Court relied upon both M.C.D.'s fighting with the

5

security officers at the VA hospital and his express threats to his wife's life, which were made as late as the day of the hearing, as indicative of the fact that he was an imminent threat to himself or others. The District Court found, based on the testimony of the mental health professionals, that M.C.D.'s behavior was representative of and symptomatic of his mental disorder. A threat to kill another is an overt act sufficient to support a commitment on the ground that the respondent is an imminent danger to others. *In the Matter of Goedert*, 180 Mont. 484, 486-87, 591 P.2d 222, 224 (1979).

¶13 M.C.D.'s attempt to minimize his own threatening statements is ineffective. The fact that his wife was not present when M.C.D. stated the threats to Waples is immaterial to whether he was a threat to his wife. The seriousness of the threats is illustrated by the fact that mental health professionals are required by law to take precautions to provide protection when a person has communicated "an actual threat of physical violence by specific means against a clearly identified or reasonably identifiable victim." Section 27-1-1102, MCA. In this case M.C.D. communicated explicit threats to kill his wife if she did not respect him or if she called the police, and stated that he would do it with his bare hands. The lack of impulse control, insight and medical care brought on by M.C.D.'s mental disorder were both a cause of these threats and evidence that the danger to his wife was real and imminent. An imminent threat can be shown without evidence of actual violence or physical harm. *In the Matter of the Mental Health of D.S.*, 2005 MT 152, ¶ 15, 327 Mont. 391, 114 P.3d 264.

¶14 Similarly, M.C.D. attempts to minimize his physical confrontation with the VA security officer. While the officer was younger and larger than M.C.D. and suffered no

6

material injury from the altercation, the significance of the incident is that it illustrated how the effects of vascular dementia are exhibited in M.C.D's behavior. The incident shows that M.C.D. is combative when a person not suffering from dementia might not be, and that he could hurt someone who is not a larger, younger, stronger person or provoke such a person to hurt him. The confrontation with the officer was probative of the need for commitment.

¶15 The District Court further found that M.C.D.'s refusal to accept medical treatment, which Waples and Dr. Nagy testified arose from his mental disorder, indicated that he was unable to take care of his basic need for health and safety. The District Court found that M.C.D.'s "aversion to medical treatment, agitation, anger, and hostility to his health care providers creates treatment difficulties and places his care-givers at risk of injury. The degenerative nature of M.C.D.'s mental disorder coupled with his refusal to participate in medical treatment, created an imminent risk of injury to himself. The District Court found that M.C.D.'s mental disorder prevents him from understanding the need to take medication and to ensure that his medical needs were being met.

¶16 M.C.D. argues that there was no evidence that the threat of harm to himself or others or the inability to provide for his own care was "because of" the mental disorder as required by § 53-21-126(4), MCA. To the contrary, the mental health professionals established without contradiction that M.C.D.'s behaviors and symptoms that they were concerned about were all present because of the mental disorder. M.C.D. presented no contradictory evidence. Therefore, based upon the facts presented to the District Court,

the findings that M.C.D. suffered from a mental disorder and that he required commitment were supported by substantial evidence and were not clearly erroneous.

¶17    Affirmed.

/S/ MIKE McGRATH

We concur:

/S/ MICHAEL E WHEAT
/S/ PATRICIA O. COTTER
/S/ BRIAN MORRIS
/S/ JIM RICE