FILED

January 13 2015

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 14-0054

DA 14-0054

IN THE SUPREME COURT OF THE STATE OF MONTANA

2015 MT 8

SONJA WOODS, individually and as Personal
Representative of the ESTATE OF CATHERINE WOODS;
and WILLIAM WOODS, individually,

        Plaintiffs and Appellants,

   v.

STATE OF MONTANA by and through the MONTANA
STATE HOSPITAL, a state mental health facility,

        Defendants and Appellees.

APPEAL FROM:    District Court of the First Judicial District,
                   In and For the County of Lewis and Clark, Cause No. BDV 2009-58
                   Honorable Jeffrey M. Sherlock, Presiding Judge

COUNSEL OF RECORD:

       For Appellant:

              John L. Amsden, Justin P. Stalpes, Anthony F. Jackson, Beck & Amsden,
              PLLC, Bozeman, Montana

       For Appellee:

              W. Anderson Forsythe, Christopher T. Sweeney, Moulton Bellingham PC,
              Billings, Montana

                            Submitted on Briefs:  November 19, 2014
                                  Decided:  January 13, 2015

Filed:

                                  _____
                                       Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1 Sonja Woods, individually and as personal representative of the Estate of Catherine Woods, and William Woods, individually, appeal from an order of the First Judicial District Court, Lewis and Clark County, granting summary judgment in favor of the State of Montana and Montana State Hospital. We affirm.

¶2 The issue presented for review is whether the Montana State Hospital had a statutory duty to warn Catherine Woods of the risk of violent behavior by her former boyfriend, Justin Schiller.

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 On June 13, 2008, Schiller was involuntarily committed to the Montana State Hospital (MSH). Schiller had been found unresponsive in his home the previous day after drinking heavily and ingesting the pain medication Percocet, which he had been prescribed for a lower-back injury. Schiller also expressed to his girlfriend, Catherine, a desire to kill himself.[1] Schiller had a long history of depression and had previously experienced anxiety, panic, and incidents of self-harm.

¶4 Schiller was released from MSH 12 days later, on June 25, 2008. On July 23, 2008, Schiller purchased a handgun. His relationship with Catherine ended sometime after his release from MSH. On November 21, 2008, Schiller saw Catherine at the Golden Spur Sports Bar & Casino in Miles City with a male acquaintance. Schiller was

---

[1] There are differing accounts of the nature and extent of Schiller's relationship with Catherine. While Schiller reported to persons at MSH that he had been in a supportive relationship with Catherine for eight months, the Woodses allege that Schiller was merely "inappropriately infatuated" with Catherine, and that she tried to put an end to the relationship early on.

consuming alcohol at the time. When Catherine and her companion left the bar, Schiller followed them. He assaulted Catherine's companion and fired multiple shots at Catherine's vehicle as she attempted to drive away. One of the shots struck Catherine in the neck, killing her. Schiller later died of a self-inflicted gunshot wound.

¶5 Catherine's parents, Sonja and William Woods, filed a complaint alleging that MSH had a statutory duty, pursuant to § 27-1-1102, MCA, to warn Catherine of the risk of violent behavior by Schiller. On November 9, 2011, the State moved for summary judgment, claiming that Schiller never communicated any specific threat of violence against Catherine during his commitment, and therefore, MSH had no duty to warn Catherine or take precautions for her protection.

¶6 The evidence before the District Court at the summary judgment stage indicates that Dr. Daniel Nauts evaluated Schiller upon his admission to MSH. During that evaluation, Schiller admitted to Dr. Nauts that his alcohol use was "a serious problem." Schiller acknowledged that while drinking, he sometimes became aggressive toward Catherine. In a subsequent deposition, Dr. Nauts stated that he believed Schiller was referring to verbal, rather than physical, aggression. Schiller also acknowledged "problems with his temper and anger control" that were exacerbated by drinking. Dr. Nauts concluded that Schiller presented a "[h]igh risk of lethality with acute alcohol intoxication," and that his personality changed under the influence of alcohol, resulting in aggressive behavior. Dr. Nauts further stated that loss of Schiller's relationship with Catherine could lead to "high-risk behavior."

3

¶7 Schiller was also interviewed by Jody Parrott five days after his admission to MSH. During that interview, Schiller acknowledged that his alcohol use was a problem, but he appeared "ambivalent or reticent to let go of it." Schiller again admitted being aggressive toward Catherine when intoxicated. Parrott noted Schiller's "history of violence towards others and himself (suicidal gestures and attempts) during periods of intoxication." Parrott also noted that loss of Schiller's relationship with Catherine "could result in continued high-risk behavior."

¶8 In Schiller's MSH discharge summary, Dr. Nauts observed that although Schiller was initially "reticent" to address his alcohol dependence, he had "realized the incredible lethality of intoxication for him" and was planning to follow through on outpatient treatment. Dr. Nauts concluded that "From a motivational standpoint this patient clearly gained from his brief stay." His final diagnosis included the notation, "Alcohol Induced Mood Disorder with intoxication with suicidal behavior, resolved."

¶9 In his deposition, Dr. Nauts acknowledged that Schiller had a history of violent behavior, and that his violence was directly related to his substance use. At the time of Schiller's discharge, Dr. Nauts believed Schiller was sincere in his intention to abstain from alcohol and continue in outpatient treatment. Dr. Nauts also stated that during the course of treatment at MSH, it is common for a social worker to contact family members of the patient. Dr. Nauts said he had never spoken with Catherine, but he believed Schiller's social worker, Ben Bornerman, had. In his deposition, Bornerman said he had contacted Schiller's father to corroborate background information, but had never

4

contacted Catherine. Bornerman also said he was on vacation the day Schiller was discharged from MSH.

¶10 The Woodses retained an expert witness, Kathleen Cullen, who intended to testify that MSH should have warned Catherine of the threat posed by Schiller because he admitted past aggression toward Catherine, was low-functioning upon release, and had an inadequate plan to refrain from high-risk behavior. Cullen concluded that "a reasonable and prudent mental health care provider" would have determined that "an actual threat of physical harm to [Catherine] existed in the event their relationship ended."

¶11 The Woodses also relied on two additional evaluation forms, neither of which clearly identifies the date of preparation or the person or organization responsible. On one form, titled "Readiness to Change," Schiller listed his relationship and "fear of losing girlfriend" as one of the five most significant things he would like to address while in treatment. Based upon representations by the parties, the District Court concluded this form was completed while Schiller was at MSH. The other form, which the District Court concluded was prepared by Dr. Susan Mattocks at Holy Rosary Healthcare in Miles City prior to Schiller's commitment and was never provided to MSH, notes "escalating violence (physical x2)" under the heading "Recent changes in current relationship status." Dr. Mattocks is not associated with MSH and there is no evidence that MSH personnel were aware of this document. The form was apparently provided to the Woodses by Dr. Mattocks, who was previously dismissed from this lawsuit, during discovery.

5

¶12 Based upon this record and following a summary judgment hearing, the District Court concluded that the Woodses had failed to establish a prima facie case against MSH for breach of its duty to warn, because "no threat was made to any MSH staff member of future physical violence nor was a specific means of violence relayed." The District Court concluded, "Absent a communication relating to future violence there can be no duty imposed under the statute." The District Court granted summary judgment in favor of the State and MSH. The Woodses appeal.

## STANDARDS OF REVIEW

¶13 We review a district court's summary judgment ruling de novo, applying the same M. R. Civ. P. 56 criteria as the district court. *Gudmundsen v. State*, 2009 MT 56, ¶ 12, 349 Mont. 297, 203 P.3d 813. Summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. M. R. Civ. P. 56; *Gudmundsen*, ¶ 12. We review a district court's conclusions of law to determine whether they are correct. *Gudmundsen*, ¶ 12.

## DISCUSSION

¶14 *Whether the Montana State Hospital had a statutory duty to warn Catherine of the risk of violent behavior by Schiller.*

¶15 Section 27-1-1102, MCA, states: "A mental health professional has a duty to warn of or take reasonable precautions to provide protection from violent behavior only if the patient has communicated to the mental health professional an actual threat of physical violence by specific means against a clearly identified or reasonably identifiable victim." The Woodses claim MSH had a duty under § 27-1-1102, MCA, to warn

6

Catherine that Schiller could behave violently if their relationship ended and if Schiller was drinking alcohol. They argue that a mental health professional is required to exercise his or her specialized knowledge and skills in determining when communications by the patient may indicate that he or she poses a threat to another individual. The Woodses claim Schiller's admitted past aggression against Catherine and the possibility of continued high-risk behavior was sufficient to put a reasonably skillful mental health professional on notice of the danger Schiller presented.

¶16    The State responds that the plain language of § 27-1-1102, MCA, establishes a narrow duty, requiring communication of an actual threat of physical violence by specific means. The State argues the Woodses' interpretation disregards this plain language, and instead imposes a "reasonably prudent" standard not contemplated by the statute. The State claims there is nothing in the record demonstrating that Schiller communicated to MSH personnel an actual threat of physical violence by specific means against Catherine.

¶17    Section 27-1-1102, MCA, was enacted in 1987 in response to legal developments occurring in other jurisdictions, notably the decision of the California Supreme Court in *Tarasoff v. Regents of University of California*, 551 P.2d 334 (Cal. 1976). *Gudmundsen*, ¶ 18. In *Tarasoff*, the California Supreme Court held, "once a therapist does in fact determine, or under applicable professional standards reasonably should have determined, that a patient poses a serious danger of violence to others, he bears a duty to exercise reasonable care to protect the foreseeable victim of that danger." 551 P.3d at 345. *Tarasoff* was later narrowed by *Thompson v. County of Alameda*, 614 P.2d 728, 738 (Cal. 1980), which held that the duty to warn was established only where a threat existed

7

against "a named or readily identifiable victim or group of victims who can be effectively warned of the danger . . . ." Statutes passed in response, like Montana's, may be narrower yet, requiring communication of an actual threat of physical violence against a named or reasonably identifiable victim. *See, e.g., Gudmundsen*, ¶ 21; *DeVasier v. James*, 278 S.W.3d 625, 632 (Ky. 2009); *Robinson v. Mount Logan Clinic*, 182 P.3d 333, 335 (Utah 2008).

¶18 In *Gudmundsen*, ¶ 31, we held that the duty established by § 27-1-1102, MCA, is "extremely narrow." The duty to warn exists only where, according to the plain language of the statute, there exists proof of (1) an actual threat of physical violence, (2) by specific means, (3) against a clearly identified or reasonably identifiable victim. *Gudmundsen*, ¶ 31. Thus, in *In re Mental Health of M.C.D.*, 2010 MT 15, ¶ 13, 355 Mont. 97, 225 P.3d 1214, we considered a man's statement that he would kill his wife with his bare hands if she ever called the police to constitute an actual threat of physical violence by specific means against an identified victim. Our analysis in *Gudmundsen* and *M.C.D.* is consistent with statements of the Kentucky Supreme Court, construing similar statutory language:

> [W]e believe the legislature intended to require a current, active expression, by words or gestures, verbal or non-verbal, to the professional; a threat capable of avoidance, not a mere passive presence from which the professional must attempt to discern if a patient poses a threat of harm. . . . Simply *being* a threat of physical violence does not constitute communicating a threat of physical violence.

*DeVasier*, 278 S.W.3d at 632 (emphasis in original). We agree that "being" a threat generally of committing physical violence does not satisfy the statutory criteria of

8

communicating an actual threat of physical violence by specific means. Absent a specific expression or gesture against a reasonably identifiable victim, the duty to warn is not triggered.

¶19 The District Court correctly concluded that nothing in the record establishes that Schiller communicated to personnel at MSH an actual threat of physical violence by specific means against Catherine. The fact that he may have presented a potential danger to Catherine under certain circumstances, including his continued alcohol abuse and the end of their intimate relationship, is not sufficient to trigger the statutory duty to warn. Section 27-1-1102, MCA, does not impose upon mental health professionals a broad duty to infer, investigate, or otherwise deduce whether their patients may pose a potential threat to other individuals. Although the Woodses urge this Court to apply general common law principles of foreseeability, similar to those recognized by the California Supreme Court in *Tarasoff*, the Legislature rejected this approach when it adopted § 27-1-1102, MCA. "In this state there is no common law in any case where the law is declared by statute." Section 1-1-108, MCA. The law applicable in this case is plainly declared by § 27-1-1102, MCA. The Woodses have failed to present evidence establishing the requirements of that statute.

**CONCLUSION**

¶20 A mental health professional has a duty to warn only where the narrow requirements of § 27-1-1102, MCA, are satisfied because the patient has communicated an actual threat of physical harm by specific means against a clearly identified or reasonably identifiable victim. The record contains no evidence that an actual, specific

threat was communicated in this case. The State is therefore entitled to judgment as a matter of law, and the District Court did not err when it granted summary judgment in favor of the State and MSH.

¶21 Affirmed.

/S/ LAURIE McKINNON

We Concur:

/S/ MIKE McGRATH
/S/ BETH BAKER
/S/ PATRICIA COTTER
/S/ JIM RICE