No. 82-504

IN THE SUPREME COURT OF THE STATE OF MONTANA

1983

---

IN THE MATTER OF R█ T███████,

Respondent.

---

Appeal from:   District Court of the Thirteenth Judicial District,
               In and for the County of Yellowstone
               Honorable William J. Speare, Judge presiding.

Counsel of Record:

        For Appellant:

            Terry L. Seiffert, Billings, Montana

        For Respondent:

            Harold F. Hanser, County Attorney, Billings, Montana

---

Submitted on briefs: February 3, 1983

Decided: June 30, 1983

Filed:  JUN 30 1983

*Ethel M. Harrison*
_____
                    Clerk

Mr. Justice Frank B. Morrison, Jr. delivered the Opinion of the Court.

Respondent R.T. appeals from a commitment order entered in the Thirteenth Judicial District Court, Yellowstone County.

The sole issue is whether there was sufficient evidence to find that respondent was "seriously mentally ill" under section 53-21-102(14), MCA. We find the evidence to be legally insufficient and vacate the commitment order.

On October 7, 1982 the Yellowstone County Attorney filed a petition for commitment with the Yellowstone County District Court. The allegations contained in the petition were based on a letter from a psychiatric nurse from the South Central Montana Regional Mental Health Center and a "Request for Commitment" submitted to the county attorney by R.T.'s sisters, both of which were filed in conjunction with the commitment petition.

The petition alleges that R.T. is a long term patient at the South Central Montana Regional Mental Health Center; that "he is very paranoid and believes that everything - food and water - is poisoned;" that he only eats chicken soup from a can and drinks tea because of his delusion that everything is poisoned; that he refuses to take his medication for his mental condition; that he is very hostile and suspicious; and that he is unable to care for himself and protect his health and safety.

The district court found probable cause to believe R.T. was seriously mentally ill and that same day issued orders for his examination and detention pending hearing.

A combined adjudicatory and dispositional hearing was held before Judge William Speare the following day. Dr. Thomas Van Dyk, a psychiatrist who had examined R.T. the

2

previous day and treated R.T. for the preceding five years, testified. On the basis of the testimony, Judge Speare found R.T. to be seriously mentally ill as defined in Section 53-21-102, MCA and ordered him committed to Warm Springs State Hospital for a period not to exceed three months.

For the purposes of hearing before the trial court and appeal to this court, respondent concedes that he suffers from a mental disorder, specifically paranoid schizophrenia, which is evidenced in part by his belief that his food is poisoned. However, respondent contests the sufficiency of the evidence to establish that his mental disorder has deprived him of the ability to protect his life or health.

Section 53-21-127(2), MCA provides for the involuntary commitment of persons who have been found to be "seriously mentally ill." Section 53-21-102(14), MCA defines "seriously mentally ill" as meaning "suffering from a mental disorder which has resulted in self-inflicted injury or injury to others or the imminent threat thereof or which has deprived the person afflicted of the ability to protect his life or health."

The standard of proof required in involuntary commitment proceedings is statutorily bifurcated: (1) with respect to physical facts or evidence, there must be proof beyond a reasonable doubt; and (2) as to all other matters, including the existence of a mental disorder, there must be clear and convincing evidence. In the Matter of N.B. (1980), ____Mont____, 620 P.2d 1228, 37 St.Rep. 2031, construing Section 53-21-126(2), MCA, in light of Addington v. Texas (1979), 441 US 418, 99 S.Ct 1804, 60 L.Ed.2d 323.

During the October 8, 1982 hearing, Dr. Van Dyk testified that respondent was seriously mentally ill as defined by Montana law. Such testimony is permitted under

3

Section 53-21-126(4), MCA, but its sufficiency is dependent on accompanying evidence, from either a professional person or someone else, that (1) the person is suffering from a mental disorder, and (2) the mental disorder has deprived the person of the ability to protect his life or health.

Respondent maintains Dr. Van Dyk's conclusion, and therefore the district court's finding, is legally insufficient because the record is devoid of any evidence that respondent was unable to protect his life or health at that time. Respondent contends that the definition of "seriously mentally ill" does not provide for, nor include, imminent or prospective inability to protect one's life or health. Respondent contends that under Montana law he cannot be deprived of his liberty on the basis of such an eventuality.

We agree. The plain meaning of the language employed in the statutory definition of "seriously mentally ill" does not encompass mental disorders which pose an imminent threat of depriving a person of the ability to protect his life or health. We construe the relevant portion of Section 53-21-104(14), MCA, to require a finding of existing conditions which evince that an individual is unable to protect his life or health.

Because the testimony before the trial court does not clearly and convincingly establish that at the time of hearing respondent was unable to protect his life or health, it is insufficient as a matter of law.

At the time of hearing respondent was residing in a hotel in Laurel, Montana, living on his monthly disability income, and eating at the cafe in the hotel. Despite the fact Dr. Van Dyk testified respondent did not eat "properly," he did not further elaborate on facts which would support his

4

conclusion that respondent was unable to protect his life or health.

Dr. Van Dyk was twice asked whether respondent was able to care for himself. The gist of one answer was that respondent would be better off in another situation and that Warm Springs was the only place that would take him. Dr. Van Dyk's second response was only that respondent would "take worse and worse care of himself" if the present situation were allowed to continue. Referring to respondent's historical tendency to deteriorate after being released from Warm Springs, Dr. Van Dyk candidly admitted that by the commitment proceeding, they were "trying to do something about it before it gets bad this time."

As to respondent's existing condition, Dr. Van Dyk testified that respondent had not been drinking (drinking aggravates his paranoia); he did not manifest suicidal gestures; upon physical examination, he appeared to be "normal," though lacking teeth, well-nourished and attending to his personal hygiene.

Respondent testified that he lived at the hotel because it was "the most reasonable place [he] could get in town." He said he got "along okay" when asked if he was eating properly and that he was able to take care of his personal hygiene needs, although he admitted he could do better.

The remainder of the testimony regarded the least restrictive alternatives suitable for treating R.T.

The evidence simply does not clearly and convincingly prove that respondent's existing condition was such that his mental disorder had deprived him of the ability to protect his life or health.

We concur in the sentiments expressed by the Arizona Court of Appeals in construing a statute which defined

5

"gravely disabled," for the purposes of involuntary commitment, to mean a condition in which a person is unable to provide for his basic personal needs for food, clothing and shelter as a result of a mental disorder. The court said:

> "The statutory definition of 'gravely disabled' is limited to persons who are incapable of providing for their basic survival needs because of a mental disorder. As long as appellant can provide himself with adequate food, clothing and shelter, he does not come within that definition, despite the likelihood that he will decompensate, give away his money, and become dependent on social agencies. It is one thing to commit an individual who cannot function sufficiently to supply basic survival needs, and another to commit an individual who merely 'chooses to live under conditions that most of society would conclude to be substandard . . . ' (Citation omitted.)"

Pima County v. Kaplan (Ariz. App. 1980) 124 Ariz. 510, 605 P.2d 912, 914.

The commitment order is hereby vacated.

_____
Justice

We concur:

_____
Chief Justice

_____

_____
Justices

6

Mr. Justice Fred J. Weber dissents as follows:

I respectfully disagree with the essential conclusion of the majority opinion that the evidence does not clearly and convincingly prove that the respondent's existing condition was such that his mental disorder had deprived him of the ability to protect his life or health.

The petition alleged that R. T. refuses to take his medication for his mental condition. Dr. Van Dyk, who had treated R. T. for five years testified there was no way to keep R. T. taking his medication when he lives by himself. In response to questions as to the form of medication, he described it. Counsel then asked if it would be possible for a public health nurse to check in once a day to make sure he takes his medication, and Dr. Van Dyk pointed out he had not been able to get that done because they would only come in once a week and he again stated that when R. T. is at own place, there is no way to get him to do anything he doesn't want to do. This is confirmed by R. T. who testified as follows:

"Q. When you are at home alone, are you willing to take your medication?

"A. I do better without it.

"Q. Consequently, even if the doctor recommends it, you prefer not to take it, is that correct?

"A. Right."

This uncontradicted evidence establishes that R. T. does refuse to take his medicine and therefore is unable to protect his health by the taking of the necessary medication.

The majority opinion also mentions that Dr. Van Dyk had testified that R. T. had not been drinking. (Drinking aggravates his paranoia.) The substance of Dr. Van Dyk's testimony was that R. T. had not been drinking at the time he saw him at the hospital approximately five days before.

However, the doctor pointed out that R. T. was drinking, by his own admission, after he had left the state hospital at Warm Springs where he had been sent by the doctor on a voluntary basis.

With regard to the place where he recommended treatment, Dr. Van Dyk stated:

"Q. Consequently, do you feel that the respondent is able to care for his own needs?

"A. I do not feel he is. We have tried him at one of our mental health center group homes, and they were unable to tolerate him. I've been unable to get other nursing homes to take him. I sent him to Warm Springs State Hospital on a voluntary basis, and he only stayed a few days; and that's the reason for this proceeding at present, because he has gotten worse again.

"Q. Doctor, what would be the least restrictive treatment facility available for the respondent?

"A. I believe the State Hospital at Warm Springs would be, because we've not been able to find any other facility to take him and keep him."
(emphasis added)

Dr. Van Dyk pointed out that a foster home would not tolerate R. T. because of his drinking and that a group home also was unable to tolerate it and that he had been unable to find a nursing home to take care of him.

While I agree with the necessity for protecting a person from involuntary commitment, I believe there is both clear and convincing evidence of the inability of R. T. to protect his health. While the testimony may not be a model of proof, it is important to keep in mind that Dr. Van Dyk is a psychiatrist who has attended R. T. for five years, and there was no attempt to submit information to rebut his testimony. This is not a suspect case in which the circumstances suggest an inadequate examination or insufficient consideration of R. T.'s problem. The record establishes that the treating psychiatrist had attempted a voluntary commitment at Warm Springs which was unsuccessful and has been unable to find a

foster home, group home or nursing home which could take him, particularly because of his drinking problem and its aggravation of his mental condition.

I would affirm the District Court.

_____
Justice

We join in the foregoing dissent of Mr. Justice Fred J. Weber.

_____
Justice

_____
Justice