FILED

March 5 2013

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

DA 12-0433

IN THE SUPREME COURT OF THE STATE OF MONTANA

2013 MT 59

IN THE MATTER OF:

R.F.,

      Respondent and Appellant.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DI 12-42
Honorable Mary Jane Knisely, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

            Wade Zolynski, Chief Appellate Defender; Nicholas Domitrovich,
Assistant Appellate Defender, Helena, Montana

      For Appellee:

            Timothy C. Fox, Montana Attorney General; Mardell Ployhar, Assistant
Attorney General, Helena, Montana

            Scott Twito, Yellowstone County Attorney; Mark English, Deputy County
Attorney, Billings, Montana

Submitted on Briefs:   January 31, 2013

Decided:   March 5, 2013

Filed:

_____
Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1     R.F. appeals an order of the District Court for the Thirteenth Judicial District, Yellowstone County, involuntarily committing him to the Montana State Hospital (MSH). We affirm.

¶2     We address the following issues on appeal:

¶3     1.     Whether there was sufficient evidence presented for the District Court to determine that R.F. required commitment because he was either unable to care for his basic needs or was a threat to others.

¶4     2.     Whether R.F. received ineffective assistance of counsel.

¶5     R.F. raises a third issue contending there was insufficient evidence to support an order authorizing the involuntary administration of medication. While the District Court makes a finding of fact that R.F. "needs the involuntary admission of medication to improve his mental state," there are no provisions contained in the District Court's order which authorize the involuntary administration of medication to R.F. Additionally, the State concedes that the record does not support such a provision. Accordingly, this Court will not address whether an order for involuntary administration of medication was correct.

## FACTUAL AND PROCEDURAL BACKGROUND

¶6     On June 15, 2012, the Yellowstone County Attorney's Office filed a petition for involuntary commitment of R.F. The District Court reviewed the petition and determined that there was probable cause to believe R.F. suffered from a mental disorder, and that R.F. met the statutory criteria for involuntary commitment. The court appointed counsel

2

to represent R.F., ordered R.F. detained at the Billings Clinic Psychiatric Center pending resolution of the petition, and set an initial hearing on the petition for June 18, 2012.

¶7 At the initial hearing, the court advised R.F. of his rights pursuant to the petition, appointed Robert W. McDermott, MD, as the professional person to evaluate R.F., and set an evidentiary hearing for June 21, 2012. Dr. McDermott filed his report with the court on June 20, 2012.

¶8 On June 21, 2012, the court conducted the evidentiary hearing on the petition. Billings Police Officer Harley Cagle (Officer Cagle) testified that he responded to Albertson's grocery store for someone who believed they had been assaulted. Officer Cagle entered the store and walked to the back where he found R.F. on the phone. R.F. was very excited and upset. R.F. immediately began to relate that two black men just tried to kill him. R.F. started pointing at people throughout the store indicating that they were part of "it" and that particular people were on methamphetamines. R.F. explained to Officer Cagle that he worked with the Bureau of Alcohol, Tobacco, and Firearms (ATF) and that a large shipment of methamphetamines was coming which R.F. needed to stop. Officer Cagle testified that it was apparent R.F. was suffering from a mental illness because his thoughts were chaotic, he was incoherent and delusional, and R.F. kept switching from one story to another. Officer Cagle described that he "couldn't get through" to R.F. or calm him down. Based upon R.F.'s behaviors, Officer Cagle was afraid R.F. would hurt himself or someone else. It was apparent to Officer Cagle that R.F. needed to be evaluated for a mental disorder.

3

¶9     Officer Cagle further testified that Officer Wanchena arrived at Albertson's and assisted Officer Cagle. Officer Cagle learned from Officer Wanchena that a similar disturbance with R.F. had occurred a week earlier. Despite the officers' efforts, R.F.'s delusional state and fearfulness continued and could not be quieted. When the officers patted R.F. down for transport, R.F. thought a sniper was attempting to shoot him and he tried to protect himself by leaning down next to the patrol vehicle. Once in the vehicle, R.F. laid down in the back seat so that he would not be exposed to any attack.

¶10    R.F. was transported to the Billings Clinic Psychiatric Center where he was evaluated by Dr. McDermott, a psychiatrist and the medical director of the Psychiatric Center. Dr. McDermott has been a board certified psychiatrist since 1984, having received his medical training at Yale Medical School, Johns Hopkins University, and Sheppard Pratt Hospital. There was no challenge to Dr. McDermott's credentials or his qualifications as a professional person.

¶11    Dr. McDermott testified he first encountered R.F. in the emergency room. R.F. was lying naked on the cart and partially covered by a sheet. R.F. was actively masturbating. Dr. McDermott related that R.F. had been very threatening towards the emergency room staff, was confrontational, and was "quite difficult to deal with." Dr. McDermott described R.F. as "overtly psychotic and delusional." Particularly, R.F. expressed multiple delusions, had a "flight of ideas," and changed subjects repeatedly from one topic to another. Dr. McDermott soon learned that R.F.'s major delusions centered around amphetamines and drugs, and that R.F. believed he worked with the Drug Enforcement Agency and the FBI. R.F.'s secondary delusions included having

4

massive wealth and owning homes across the country. Additionally, R.F. was fearful and paranoid of people trying to harm him. Dr. McDermott opined that R.F. suffered from severe psychosis, likely a bipolar or manic-depressive disorder, and has likely suffered from the illness for a long period of time.

¶12 It was Dr. McDermott's medical opinion that because of R.F.'s lack of insight and the severity of his mental disorder, R.F. would be unable to follow through with his treatment regimen and, in very short order he would be back in the same condition he was in upon his admission. Dr. McDermott opined that R.F. could not "sustain himself" if his condition were left untreated and that R.F. would be a threat to others. Dr. McDermott based his opinion, in part, on the condition of R.F.'s feet when admitted, that R.F. was homeless and appeared to have no resources, and R.F.'s fearfulness and paranoia. Due to the severity of R.F.'s illness, Dr. McDermott indicated there was nothing available in the community and that MSH would be the least restrictive environment for treatment.

¶13 R.F. testified in his own defense. R.F. indicated that the incident at Albertson's occurred when "two brothers that had beaten [him] up that morning" approached him at the meat counter. R.F. testified he was scared and started yelling "[t]hese guys are trying to beat me up." R.F. alluded to their use of meth and that there were hundreds of them— "just waves of these methamphetamine addicts"—coming to look at him. R.F. also testified about difficulties with his family and represented that his family has a restraining order against him.

**ISSUE 1.**

5

¶14    *Whether there was sufficient evidence presented for the District Court to determine that R.F. required commitment because he was either unable to care for his basic needs or was a threat to others.*

¶15    **A.    Standard of Review.**

¶16    We review a district court's order of commitment "to determine whether the court's findings of fact are clearly erroneous and its conclusions of law are correct." *In re Mental Health of L.K.-S.*, 2011 MT 21, ¶ 14, 359 Mont. 191, 247 P.3d 1100. A finding of fact is clearly erroneous if "it is not supported by substantial evidence, if the district court misapprehended the effect of the evidence or if, after a review of the entire record, we are left with the definite and firm conviction that a mistake has been made." *L.K.-S.*, ¶ 14; *see also In re C.R.*, 2012 MT 258, ¶ 12, 367 Mont. 1, 289 P.3d 125.

¶17    We require "strict adherence" to the statutory scheme governing involuntary commitment due to the "critical importance" of the constitutional rights at stake. *L.K.-S.*, ¶ 15 (citing *In re Mental Health of C.R.C.*, 2004 MT 389, ¶ 16, 325 Mont. 133, 104 P.3d 1065; *In re Mental Health of T.J.D.,* 2002 MT 24, ¶ 20, 308 Mont. 222, 41 P.3d 323).

¶18    Finally, an appeal from an order of involuntary commitment is not moot despite the appellant's release, since the issues are capable of repetition and the matter would otherwise escape review. *C.R.*, ¶ 14 (citing *In re Mental Health of D.V.*, 2007 MT 351, ¶ 32, 340 Mont. 319, 174 P.3d 503).

¶19    **B.    Analysis.**

¶20    The standard of proof for a commitment hearing, set forth in § 53-21-126(2), MCA, is for all physical facts and evidence to be proven beyond a reasonable doubt and

6

all other matters to be proven by clear and convincing evidence, with the exception of mental disorders which must be proven to a reasonable degree of medical certainty.

¶21 At the trial on a petition for involuntary commitment, a court must first determine whether the respondent suffers from a mental disorder as defined in § 53-21-102(9), MCA. Section 53-21-126(1), MCA. R.F. does not contest the District Court's finding that he suffers from a mental disorder.

¶22 Upon a finding that a person suffers from a mental disorder, the court must next determine whether one of the following criteria has been met:

> (a) whether the respondent, because of a mental disorder, is substantially unable to provide for the respondent's own basic needs of food, clothing, shelter, health, or safety;
> (b) whether the respondent has recently, because of a mental disorder and through an act or an omission, caused self-injury or injury to others;
> (c) whether, because of a mental disorder, there is an imminent threat of injury to the respondent or to others because of the respondent's acts or omissions; and
> (d) whether the respondent's mental disorder, as demonstrated by the respondent's recent acts or omissions, will, if untreated, predictably result in deterioration of the respondent's mental condition to the point at which the respondent will become a danger to self or to others or will be unable to provide for the respondent's own basic needs of food, clothing, shelter, health, or safety. Predictability may be established by the respondent's relevant medical history.

Section 53-21-126(1), MCA. If the court is satisfied that any one of the criteria listed above is met, then commitment may be ordered. Section 53-21-127(7), MCA.

¶23 The District Court determined that R.F. is unable to care for himself and is a threat to others, that "[R.F.] needs constant supervision to ensure his basic needs are met and he does not harm someone else," and that "[R.F.] lacks the mental ability to provide himself

7

with the necessities of life. He is psychotic." Although not abundantly clear from the order, the District Court's findings and the record support determinations under § 53-21-126(1)(a) and (c), MCA. In order to address the criteria set forth in § 53-21-126(1), MCA, we must consider the significance of Dr. McDermott's testimony.

¶24 Dr. McDermott was the professional person appointed by the District Court to examine R.F. During the trial, the professional person may "testify as to the ultimate issue of whether the respondent is suffering from a mental disorder and requires commitment." Section 53-21-126(4), MCA. The testimony, however, is insufficient unless accompanied by evidence from the professional person that the respondent, because of a mental disorder, is unable to provide for the respondent's own basic needs of food, clothing, shelter, health, or safety (§ 53-21-126(4)(a), MCA), or because of a mental disorder, there is an imminent threat of injury to the respondent or to others because of the respondent's acts or omissions (§ 53-21-126(4)(c), MCA).

¶25 Consistent with § 53-21-126(4), MCA, Dr. McDermott opined that R.F. suffered from a mental disorder which required his commitment. Particularly, R.F. was "overtly psychotic" and suffered from a severe mental disorder characterized by grandiose delusions, fearfulness, and paranoia. He lacked any insight into his behaviors, and he presented to the hospital homeless and with cracks on the soles of his feet. Dr. McDermott opined that R.F. has not been able to sustain himself outside of a hospital environment. In particular, Dr. McDermott testified:

> [I]n very short order he would be in trouble. He has no insight about what
> has occurred or that he's got these problems. I think the chances that he
> would follow up or take medication outside the context of the hospital are

8

zero. So he would be back into what this looks like in his current state for a number of weeks and months, but in particular very recently with his admission.

¶26 In considering first the criteria of § 53-21-126(1)(a), MCA, it is not necessary to present evidence of overt acts to prove that respondent suffers from a mental disorder that renders him substantially unable to provide for his basic needs. *In re G.P.*, 246 Mont. 195, 198, 806 P.2d 3, 6 (1990) (citing *In re C.M.*, 195 Mont. 171, 173-74, 635 P.2d 273, 274-75 (1981)). Evidence of overt acts is only necessary where the commitment is based upon the imminent threat of self-inflicted injury or injury to others. *G.P.*, 246 Mont. at 198, 806 P.2d at 6 (citing § 53-21-126(2), MCA).

¶27 This is not the first instance this Court has considered the expert opinion of a professional person in order to assess the ability of a severely mentally ill person to provide for their basic necessities. In *In re Mental Health of L.C.B.*, 253 Mont. 1, 830 P.2d 1299 (1992), the respondent had been arrested in connection with an automobile accident. While in custody, he appeared disoriented and confused, prompting law enforcement officials to ask that he be evaluated for a mental illness. After examining L.C.B., a psychiatrist diagnosed him as suffering from chronic paranoid schizophrenia which significantly impaired his ability to meet his own basic needs and protect his life and health. *L.C.B.*, 253 Mont. at 2, 830 P.2d at 1300. L.C.B. suffered from hallucinations which impaired his ability to process information and respond to even the simplest of tasks. The uncontradicted testimony indicated that L.C.B. demonstrated an inability to take care of or assess his basic health needs, thus his commitment was affirmed by this Court. *L.C.B.*, 253 Mont. at 6, 830 P.2d at 1303.

9

¶28 Similarly, in *G.P.*, the professional person appointed to examine G.P. diagnosed him as a severe chronic paranoid schizophrenic who, without medication, developed severe auditory hallucinations that directed him to do things he could not control, thus depriving him of the ability to protect his own life and health. *G.P.*, 246 Mont. at 198, 806 P.2d at 5. While recognizing that "[i]t is one thing to commit an individual who cannot function sufficiently to supply basic survival needs, and another to commit an individual who merely 'chooses to live under conditions that most of society would conclude to be substandard,' " this Court found the record indicated G.P.'s illness was interrupting his cognitive processes, causing delusional thinking, and was severely interfering with G.P.'s functioning. *G.P.*, 246 Mont. at 199-200, 806 P.2d at 5 (quoting *In re R.T.*, 204 Mont. 493, 665 P.2d 789, 791 (1983)). Hence, G.P.'s commitment was affirmed.

¶29 In the instant case, R.F. maintains that cracked calluses due to wearing sandals does not constitute an inability to provide for one's safety, and that a finding under § 53-21-126(1)(a), MCA, is not supported by the record. R.F. is correct that this fact, in and of itself, would be insufficient for a court to determine a person was not able to provide for their basic necessities. However, the record in the instant proceedings provides considerably more evidence than just cracked feet. In addition to Dr. McDermott's medical diagnosis that R.F. was severely psychotic, and evidence proven beyond a reasonable doubt that R.F. was delusional, fearful, and paranoid, there is evidence that R.F. was without adequate housing or shelter. Although R.F.'s precise living situation in Billings was unclear at the hearing, the District Court found that R.F.

"is a divorced, unemployed, older man who was living with his elderly parents in Powell, Wyoming." R.F. testified that his father had passed away, and that he had cared for his mother who had dementia. R.F. also testified that his sister was currently taking care of his mother. R.F. indicated that he could not return to his mother's home because "they have a restraining order on me not to go there." Dr. McDermott testified that R.F. was homeless and appeared to be without any resources.

¶30 Based upon the foregoing, there is substantial evidence that R.F.'s illness deprived him of the ability to take care of his "own basic needs of food, clothing, shelter, health or safety." Section 53-21-126(1)(a), MCA. No home or residence was established for R.F., R.F. presented to admissions at the Billings Clinic with cracks on the soles of his feet, and R.F. was delusional and severely psychotic. Dr. McDermott opined that R.F. lacked the insight to understand his problems or adequately care for himself. The District Court did not misapprehend the effect of the evidence, nor does a review of the record leave this Court with a definite and firm conviction that a mistake has been committed. The finding by the District Court that R.F. suffered from a mental disorder which prevented R.F. from providing for his basic necessities of life was not clearly erroneous.

¶31 R.F. further maintains that the District Court erred in finding the criteria of § 53-21-126(1)(c), MCA, "imminent threat of injury to the respondent or to others," in that no overt acts indicating R.F. was a threat to himself or others were established. R.F. argues that the District Court incorrectly relied on hearsay statements made by R.F.'s family to Dr. McDermott which were contained in Dr. McDermott's written report. Although this Court has determined to affirm the District Court under the criteria of

11

§ 53-21-126(1)(a), MCA, and it is sufficient for any one of the eligibility criteria to be met in § 53-21-126(1), MCA, the record in these proceedings also supports the District Court's finding that R.F. was a threat to others pursuant to § 53-21-126(1)(c), MCA.

¶32     The "overt acts" requirement necessary for a finding that a respondent is a threat to himself or others was addressed in *In re D.D.*, 277 Mont. 164, 920 P.2d 973 (1996). In *D.D.*, the professional person testified at D.D.'s commitment hearing that D.D. was a potential danger to himself and others because he was consistently paranoid and afraid that someone was about to attack him. The professional person further testified that D.D. could very easily attack someone out of fear of being attacked himself and his inability to control his paranoia. *D.D.*, 277 Mont. at 168-69, 920 P.2d at 975. This Court held that D.D.'s statements to the professional person constituted overt acts satisfying statutory requirements. *D.D.*, 277 Mont. at 168-69, 920 P.2d at 975.

¶33     Similarly, this Court affirmed a commitment in *In re Mental Health of A.S.B.*, 2008 MT 82, 342 Mont. 169, 180 P.3d 625, based on the threat of injury created by a respondent's delusional belief that local police officers were in a conspiracy against him. A.S.B. repeatedly placed himself in situations where police were required to investigate. A.S.B. was living out of his truck and normally A.S.B.'s activities were innocent. Upon being encountered by police, however, A.S.B. would become upset and begin yelling, believing that police were harassing him and conspiring against him. *A.S.B.*, ¶¶ 7-9.

¶34     In the instant case, R.F. created a disturbance in the grocery store because he believed he had been assaulted. He yelled and pointed at people he believed were involved in assaulting him and accused store patrons of being methamphetamine addicts.

12

R.F. tried to hide from snipers that he believed were trying to kill him and took cover in the back seat of the patrol vehicle. R.F. was threatening to emergency room personnel and displayed inappropriate sexual behavior. He explained that he was afraid because he had been a drug smuggler, and he knew a large drug shipment into the area was about to occur. R.F.'s paranoid belief that strangers were part of a methamphetamine conspiracy trying to kill him and that snipers were planning on killing him, are overt acts which substantiate Dr. McDermott's opinion that R.F. was a threat to others.

¶35 Here, R.F.'s overt acts are his delusional behavior, paranoid beliefs, and his statements to both law enforcement and Dr. McDermott. In light of the aforementioned evidence and with no consideration of statements made by R.F.'s family members contained in Dr. McDermott's written report, we conclude that the District Court's finding that R.F. presented an imminent threat of injury to himself or others is supported by substantial evidence and is not otherwise clearly erroneous.

## ISSUE 2.

¶36 *Whether R.F. received ineffective assistance of counsel.*

¶37 **A. Standard of Review.**

¶38 In determining whether counsel provided effective assistance to a respondent in an involuntary commitment proceeding, the Court reviews five critical areas: 1) the appointment of counsel; 2) counsel's initial investigation; 3) counsel's interview with the client; 4) the patient-respondent's right to remain silent; and 5) counsel's role as an advocate for the patient-respondent. *In re Mental Health of T.J.F.*, 2011 MT 28, ¶ 33,

13

359 Mont. 213, 248 P.3d 804. R.F. has failed to demonstrate that counsel's performance was deficient.

¶39 **B. Analysis.**

¶40 R.F. argues that he was provided ineffective assistance of counsel because counsel failed to object to the admission of hearsay statements in Dr. McDermott's report, failed to generally advocate for R.F., and failed to question whether MSH was the least restrictive environment for R.F.'s treatment.

¶41 This Court has already reviewed the sufficiency of the District Court's findings of fact and order in ¶ 30 of this Opinion, without consideration of any hearsay that may have been contained in Dr. McDermott's written report, and found them sufficient. Nevertheless, M. R. Evid. 803(4) provides that statements which are made for purposes of medical diagnosis or treatment are admissible even though they are hearsay if certain criteria are established. These statements must satisfy a two-prong test before they come within the exception. *State v. Harris*, 247 Mont. 405, 412, 808 P.2d 453, 457 (1991) (citing *State v. J.C.E.*, 235 Mont. 264, 270, 767 P.2d 309, 313 (1988), *overruled in part and on other grounds by State v. S.T.M.*, 2003 MT 221, 317 Mont. 159, 75 P.3d 1257). First, the declarant's motive in making the statement must be consistent with seeking medical treatment. Second, the statement must be of a type reasonably relied upon when making diagnosis and treatment. *Harris*, 247 Mont. at 412, 808 P.2d at 457. Reliability is assured by the first prong of the test. The declarant who seeks medical treatment has a selfish motive in telling the truth, and the declarant knows that the effectiveness of the treatment received will depend in large part on the accuracy of the information provided.

14

*Harris*, 247 Mont. at 412-13, 808 P.2d at 457. Similarly, an expert may base his opinion on inadmissible evidence and may testify as to the basis of that opinion. M. R. Evid. 703 and 705. In every case, however, the admissibility of evidence must be left largely to the sound discretion of the trial judge, which includes wide latitude in determining the admissibility of expert opinion evidence. *Lynch v. Reed*, 284 Mont. 321, 334, 944 P.2d 218, 226 (1997) (citing *Cech v. State*, 184 Mont. 522, 531-32, 604 P.2d 97, 102 (1979); *Moen v. Peter Kiewit & Sons' Co.*, 201 Mont. 425, 655 P.2d 482 (1982); *Durbin v. Ross*, 276 Mont. 463, 916 P.2d 758, 767 (1996); *Cash v. Otis Elevator Co.*, 210 Mont. 319, 332, 684 P.2d 1041, 1048 (1984)).

¶42 Accordingly, had R.F. objected to these statements, the State could likely have demonstrated a basis for their admissibility. Nevertheless, the District Court's order of commitment was supported by substantial evidence without consideration of the statements made by R.F.'s family. R.F. has failed to demonstrate that counsel's performance was deficient.

¶43 R.F. also contends that his counsel failed to adequately advocate on his behalf. The record of these proceedings, however, do not bear out such a contention. Through cross-examination of Officer Cagle, R.F.'s counsel was able to demonstrate that R.F. was not observed to assault, strike, or injure anyone, and that R.F. had not been aggressive to medical staff once medications had been administered. Similarly, Dr. McDermott was questioned about how many times he had observed R.F. and whether he had witnessed any assaults by R.F. R.F.'s responses were often incoherent and delusional which, in and

15

of themselves, present difficulties for counsel. R.F. has similarly failed to demonstrate how counsel's performance was deficient.

¶44 Lastly, R.F. argues that his counsel did not object to MSH being the least restrictive environment for treatment. Dr. McDermott testified that there was nothing else available for a person with as severe a mental disorder as R.F.'s. Dr. McDermott's testimony was clear, unequivocal, and simple. This testimony, in conjunction with R.F.'s behavior and other evidence produced during the trial, made an examination to pursue a less restrictive environment, less plausible.

¶45 Based upon the foregoing, we hold that R.F. has failed to make a substantial showing that his trial counsel was ineffective. *T.J.F.*, ¶ 33.

¶46 For the foregoing reasons, the judgment of the District Court is affirmed.

/S/ LAURIE McKINNON

We Concur:

/S/ BETH BAKER
/S/ PATRICIA COTTER
/S/ MICHAEL E WHEAT
/S/ JIM RICE

16